NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion to

request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The official copy of the following opinion

will be published by the Supreme Court's Reporter of Decisions in the Official Reports advance

sheets following final action by the Court.

                                    

                 Docket No. 78011--Agenda 4--March 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOSEPH MILLER,

                               Appellant.

                                    

                      Opinion filed August 2, 1996.

                                    

     JUSTICE HEIPLE delivered the opinion of the court:

     Following a jury trial in the circuit court of Peoria County,

the defendant, Joseph Miller, was convicted of six counts of first

degree murder. 720 ILCS 5/9--1(a) (West 1992). The same jury found

the defendant eligible for the death penalty on the basis of the

defendant's having killed more than one individual. 720 ILCS 5/9--

1(b)(3) (West 1992). The jury determined that there were no

mitigating factors sufficient to preclude imposition of a sentence

of death. The trial court sentenced defendant to death. The

defendant's sentence has been stayed (134 Ill. 2d R. 609(a))

pending direct appeal to this court (Ill. Const. 1970, art. VI,

§4(b); 134 Ill. 2d R. 603). For the reasons which follow, we affirm

the defendant's conviction and sentence of death.

     On appeal to this court, defendant argues that: (1) the trial

court erred in failing to suppress statements he made to the

police; (2) the trial court erred in admitting DNA evidence; (3)

evidence that he committed other crimes should not have been

admitted; (4) the trial court improperly allowed hearsay testimony

regarding his possession of a car; (5) a detective should not have

been allowed to testify about women's clothing recovered from

defendant's apartment; (6) the prosecutor made improper comments

during the closing argument at the second stage of the capital

sentencing hearing; (7) the jury instructions used at the capital

sentencing hearing did not reflect the law; and (8) the death

penalty is unconstitutional.

                                BACKGROUND

     In September of 1993, the nude bodies of three women, Marcia

Logue, Helen Dorrance and Sandra Csesznegi, were found in rural

Peoria County. The body of Marcia Logue was found in a drainage

ditch in the 500 block of South Cameron Lane on September 18, with

a pillow case stuck in her mouth. The body of Helen Dorrance was

found 50 feet from Logue's body on the same date. The body of

Sandra Csesznegi was found in a drainage ditch near Christ Church

Road on September 26. Csesznegi's body was in a state of advanced

decomposition. All three women were known prostitutes in the Peoria

area.

     The defendant was charged with six counts of first degree

murder for the murders of Logue, Dorrance and Csesznegi. The trial

was moved to Sangamon County due to extensive pretrial publicity.

     At trial the following evidence was elicited. Marcia Logue had

last been seen alive on September 15, 1993, entering a maroon-

colored car which was driven by a white male in his forties or

fifties. Helen Dorrance was last seen alive on September 11, 1993.

Sandra Csesznegi was last seen alive on September 15, 1993.

     On September 29, 1993, at approximately 11:30 p.m., Detectives

Rabe and Pyatt of the Peoria police department and Detective

Hawkins of the Peoria County sheriff's department went to the

defendant's Peoria apartment to question him about crimes in the

Peoria area. The defendant allowed the detectives into his

apartment and consented to a search of his apartment. He then

voluntarily accompanied the detectives to the Peoria County

sheriff's department. During the ride to the sheriff's department

the defendant asked the detectives what they wanted to talk to him

about. The detectives told the defendant that they would discuss

the matter when they arrived at the sheriff's department. The

defendant then stated that he knew what all this was about; that it

was "about the prostitutes in the newspaper." At that time,

defendant was read Miranda warnings.

     The defendant was questioned at the sheriff's department,

where he denied any knowledge of the murders of the three women.

During the questioning the defendant identified as his a knife

obtained during a search of a maroon Oldsmobile owned by Bernice

Faggott. The defendant stated that the police would not find any

blood on the knife. When asked to explain this statement, the

defendant replied that he thought Detective Pyatt might have

believed there was blood on the knife because of the missing women

and said that he had anticipated the police would be calling. The

defendant claimed that the knife fell out of his pocket when he was

a passenger in Faggott's car.

     At about 8:30 a.m. the next morning, the defendant agreed to

accompany Detectives Rabe and Hawkins to Cameron Lane. Detective

Rabe testified that the group first stopped at the defendant's

apartment so that the defendant could retrieve medication.

Detective Rabe stated that during the drive, he and Detective

Hawkins were speaking about the three bodies. When the detectives

reached Cameron Lane, Detective Rabe asked the defendant if the

bodies had been dumped at the same time. The defendant replied that

the bodies had been dumped at different times and stated that the

bodies were placed in a manner so that they could not be found. The

defendant then directed the detectives to Christ Church Road near

where Csesznegi's body was discovered. The defendant did not make

any reference to the precise area where Csesznegi's body was found,

but did state that the area stuck in his mind for some reason.

Throughout the drive the defendant denied having killed the three

women.

     The search of defendant's apartment revealed two robes, female

underwear, a broken mini-blind rod and a brown and white cloth

covered with what appeared to be dried blood. The police also

recovered pillows and a mattress from defendant's bedroom. These

items had reddish-brown stains. Blood splatters were also found on

a wall of the bedroom and the bed's headboard. A later search

revealed a glove, a throw rug and more women's underwear. During

the second search, the police collected hair and fibers.

     Crystal Taylor, a deputy United States marshall, testified

about a conversation she had with defendant at defendant's request

on February 1, 1994. Taylor testified that when she and defendant

were discussing the three women defendant stated, "[F]rom the

strangulation I am convinced I did these three." The defendant

indicated to her that he was afraid to go into his bedroom because

bad things had happened there. The defendant also spoke to Taylor

about the three women and looking for dump sites off a road.

     Dr. Mary Jumbelic, a forensic pathologist for Peoria County,

testified about the autopsies that she conducted on the bodies.

Logue's body revealed extensive injuries, including stab wounds and

ligature marks on her neck, left wrist and right ankle. Logue had

been the victim of a sexual assault. Other marks on Logue's body

were consistent with those that would be inflicted by the mini-

blind rod recovered from the apartment. Logue died as a result of

multiple stab wounds, blunt trauma, gagging of the mouth and

strangulation. Dorrance had been dead longer than Logue and was

also the victim of a sexual assault. She died as a result of

asphyxia, consistent with strangulation. Jumbelic believed that

Csesznegi had been dead for more than a week when she was found

because of the advanced decomposition of her body. The injuries to

Csesznegi's body showed that she too had been strangled.

     Other testimony revealed that a maroon Oldsmobile registered

to Bernice Faggott was reported missing on September 4, 1993. It

was recovered in Peoria a few blocks from the defendant's apartment

on September 22, 1993. When the car was searched, the police

discovered a rug in its trunk, a knife wedged between the front

seats, and dark stains on the back seat. Dennis Hall testified that

the defendant knew Faggott as early as July of 1993. Samuel Voight,

who owned property near Faggott's home, testified that he saw

defendant enter Faggott's screened-in porch on August 28, 1993.

     James McGovern, a security guard at defendant's apartment

complex, testified that he saw the defendant driving a maroon

Oldsmobile on two occasions in early September of 1993. The

defendant told McGovern that the car belonged to a friend. Mary

Decher and Daniel Mayes testified that they rode in a maroon car

with the defendant during the last week of August 1993. The

defendant told Decher and Mayes that he was transporting the car to

another location for a dealership. When Mayes questioned the

defendant about an insurance card he found in the glove compartment

with the name "Bernice" on it, the defendant stated that a friend

had lent him the car while the friend was on vacation. Mayes

testified that, on another occasion, the defendant told him that

two guys had stolen the car and defendant needed to get rid of it

by setting it on fire. The defendant told Mayes that he had wiped

any fingerprints from the car and left it on a street in Peoria.

When the defendant went to get the car the next day, it was

missing. Mayes and Decher testified that a rug, similar to the one

found by the police in the trunk of the maroon Oldsmobile, had been

stolen off of a chain link fence at their home around the middle of

September.

     Glenn Schubert, a forensic scientist, testified regarding the

hair and fibers recovered from the defendant's apartment, Logue's

body and the maroon car. Schubert stated that debris from the

pillow case found in Logue's mouth was consistent with the

defendant's pubic hair. Other fibers on the pillow case matched

fibers taken from a throw rug located in the defendant's apartment

and fibers collected from the defendant's living-room floor.

Several fibers taken from Logue's body also matched fibers

collected from the defendant's living-room floor. Hairs recovered

from the maroon Oldsmobile were consistent with the defendant's

hair and several acrylic-like fibers from the car were consistent

with the fibers found on defendant's floor.

     The State's DNA expert, William Frank, testified that seminal

fluid recovered from Logue matched that of defendant. Such a match

would occur in 7% of the Caucasian population. Blood recovered from

underneath Logue's fingernails also matched that of defendant and

such a match could be expected in 1 in 465 million Caucasians.

Bloodstains from a magazine, mattress, pillow and towel found in

the defendant's apartment and from the seat of Faggott's car

matched that of Logue. Such matches would occur in 1 in 1.1

trillion Caucasians. Further, blood found on a napkin and a pillow

taken from the defendant's apartment matched Dorrance's DNA

profile, with such a match occurring in 1 in 466 billion

Caucasians. Another bloodstain on one of defendant's pillows

matched the DNA profile of Csesznegi with such a match occurring in

1 in 1 billion Caucasians. On cross-examination, Frank conceded

that there were only five billion people in the world.

     The defendant did not testify on his own behalf. The parties

stipulated that several dark-colored cars had been seen near

Cameron Lane on September 16 and 17, 1993. In addition, a resident

who lived in the area where the bodies were found saw a pickup

truck with a construction rack and lettering on the side. On

several occasions, the resident saw the truck stop and its occupant

look around.

     The jury returned a verdict of guilty on all six counts of

first degree murder. The same jury found the defendant eligible for

the death penalty, as defendant was over the age of 18 and had been

convicted of murdering at least two individuals. At the second

stage of the sentencing hearing, the State presented as aggravation

evidence the defendant's convictions for two murders in 1977 and

one armed robbery in 1978. The defendant was sentenced to terms of

15 to 30 years for each of those murders and a term of four to

eight years for the armed robbery. Jack Thurmon, a Department of

Corrections' parole agent, testified that the defendant was

released from prison in April of 1993 to a mission in Cook County.

Thurmon later learned that defendant had travelled to Peoria by

September 1993.

     The defendant presented the testimony of two psychiatrists as

mitigation evidence. Dr. Sohee Lee testified that defendant

suffered from disassociative amnesia and an antisocial personality.

Dr. Lee linked the disassociative amnesia to the emotional,

physical and sexual abuse defendant received during his childhood.

Dr. Lee commented that the defendant had been in an orphanage until

he was six and was later sexually abused by his mother. Dr. Lee did

state that the defendant was happy in September 1993, as one of his

friends had sent him a bus ticket to travel to Peoria and his

friend and other church members had helped him establish his life

in Peoria. Dr. Robert Chapman testified that defendant suffered

from disassociative disorder with multiple personality disorder

type.

     At the conclusion of the second stage of the sentencing

hearing, the jury found no mitigating circumstances sufficient to

preclude imposition of the death penalty. The defendant was

sentenced to death for the three murders. Defendant's post-trial

and post-sentencing motions were denied.

                                DISCUSSION   

                                   Trial

                          Suppression of Evidence

     The defendant alleges that the trial court erred in denying a

motion to suppress various statements he made to the police on

September 29 and 30, 1993. The defendant specifically points to the

statements he made (1) in the police car on the way to the

sheriff's department and at Cameron Lane and Christ Church Road;

(2) about the knife found in Faggott's car; (3) about being in

Faggott's car; and (4) about a photograph of a mattress with blood

on it. The defendant claims that the statements were involuntary

and the result of coercion and that he was not given proper Miranda

warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d

694, 86 S. Ct. 1602 (1966). At a pretrial hearing the trial court

concluded that there was no evidence of the involuntariness, either

mental or physical, of the defendant's statements.

     In support of his contentions, the defendant highlights the

events occurring on September 29 and 30. At approximately 11:30

p.m. on September 29, three detectives arrived at the defendant's

door while several other police officers remained outside the

apartment building. The defendant allowed the detectives inside and

he consented to a search of his apartment. The defendant agreed to

accompany the detectives to the sheriff's department. The

detectives did not tell the defendant why they wanted to speak with

him. The defendant suggested that it was about the missing

prostitutes. At this juncture, defendant was read Miranda warnings.

     At the sheriff's department the defendant was placed in an

interview room and questioned periodically through the early

morning hours of September 30. At about 8:30 a.m., the defendant

was taken on a drive to Cameron Lane. The defendant was returned to

the jail at approximately 11 a.m. He was left alone until 5 p.m.

when he was questioned and taken on another car ride. After

defendant was returned to the sheriff's department, he was

questioned again. At 7:30 p.m. on September 30 the defendant was

read a second set of Miranda warnings.  

     A trial court's ruling on a motion to suppress will not be

disturbed unless that ruling is manifestly erroneous (People v.

Garcia, 97 Ill. 2d 58, 74 (1983)) and a trial court's ruling that

a statement is voluntary will not be disturbed unless that ruling

is against the manifest weight of the evidence (People v. Redd, 135

Ill. 2d 252, 292-93 (1990)). "Whether a statement is voluntarily

given depends upon the totality of the circumstances. The test of

voluntariness is whether the statement was made freely, voluntarily

and without compulsion or inducement of any sort, or whether the

defendant's will was overcome at the time he confessed." People v.

Clark, 114 Ill. 2d 450, 457 (1986).

     In the instant case, the totality of the circumstances shows

that defendant's statements were voluntary. The defendant

voluntarily accompanied the detectives to the sheriff's department.

The detectives did not use force at defendant's apartment and

although there were other officers outside the apartment, these

officers could not be seen from inside defendant's apartment.

Defendant was the one who initially stated that the police were

questioning him about the prostitutes. Although defendant was

questioned for some period of time, the questioning was not

relentless. The detectives described the tone of the questioning as

cordial. There were at least 10 breaks and the defendant was given

something to drink and the opportunity to use the restroom. The

defendant was given food to eat, at which time he was left alone

for approximately one-half hour. The defendant was never

handcuffed. In addition, the defendant agreed to accompany the

detectives to Cameron Lane and he directed the detectives to Christ

Church Road. Before driving to Cameron Lane, the detectives took

defendant to his apartment to retrieve medication. Although the

defendant now claims that he was not allowed to sleep before 11

a.m. on September 30, the defendant never indicated to the

detectives that he wished to sleep, to stop speaking with them, or

to consult with an attorney. Nothing in the record reveals that the

defendant's statements were procured through coercion. Thus, the

trial court's conclusion that the defendant's statements were

voluntary is not against the manifest weight of the evidence.

     The defendant also claims that the statements he made in the

car at Cameron Lane and his actions in directing the detectives to

Christ Church Road should have been suppressed because he had not

been given adequate and timely Miranda warnings. Defendant states

that the car trip occurred at approximately 8:30 a.m. on September

30 and that the last time he had been read Miranda warnings was the

prior day when he was driven from his apartment to the sheriff's

department after 11:30 p.m.

     This court has recently stated that "fresh Miranda warnings

are not required after the passage of several hours." People v.

Garcia, 165 Ill. 2d 409, 425 (1995). A new set of Miranda warnings

are required "only in those situations where a substantial

probability exists that warnings given at a previous interrogation

are so stale and remote that a substantial possibility exists that

the suspect was unaware of his or her constitutional rights at the

time subsequent interrogation occurs." Garcia, 165 Ill. 2d at 426.

The totality of the circumstances should be considered in

determining whether a defendant understands his constitutional

rights in post-Miranda questioning. Garcia, 165 Ill. 2d at 426.

     The totality of the instant circumstances shows that the

defendant was aware of his constitutional rights during the drive

around rural Peoria County. Although it had been several hours

since the defendant had been read Miranda warnings, the detectives

and the defendant had been discussing the instant murders and the

disappearance of Faggott throughout this time. The breaks that were

taken were not for such long periods of time that the warnings

became stale and the questioning always resumed. The defendant

agreed to accompany the detectives on the car trip and was the one

who directed the detectives to Christ Church Road. Additionally,

the defendant had prior experience with the criminal justice

system, further evidencing his knowledge of the right to remain

silent and to an attorney. See Garcia, 165 Ill. 2d at 426. Thus,

the Miranda warnings given to defendant on September 29 were not so

stale and remote that the defendant was unaware of his rights. The

trial court's decision to deny the motion to suppress was not

manifestly erroneous.

                         Admission of DNA Evidence

     Defendant argues that the trial court erred in qualifying

Frank to testify about the general acceptance and reliability of

deoxyribonucleic acid (DNA) evidence and in admitting the DNA

evidence at his trial. The trial court held a pretrial hearing on

the State's motion to admit DNA evidence. Frank was the only

individual to testify at the hearing on behalf of the State. The

defendant chose not to present any witnesses or evidence,

notwithstanding that he had been provided the time and funds to

secure an expert. After hearing testimony on Frank's background and

training, the trial court qualified him as an expert. Frank then

testified regarding the Restriction Fragment Length Polymorphism

(RFLP) method of testing DNA and the manner in which DNA matches

are calculated, including the manner in which such calculations are

made at the Illinois State Police Bureau of Forensic Sciences,

where Frank is employed. Frank testified that the techniques used

by his laboratory in calculating DNA matches and their frequency in

a population are similar to those used by the FBI. After hearing

Frank's testimony, the trial court held that based on prior

precedent in Illinois, the DNA procedures outlined in Frank's

testimony were generally accepted in the particular scientific

field and such testimony and DNA calculations would be allowed at

defendant's trial.

     Addressing the merits of defendant's arguments necessitates a

brief account of DNA profiling. DNA is the genetic code which is

found in the cells of the human body. A DNA molecule is composed of

over three billion "base pairs" of four different chemicals:

adenine, thymine, cytosine and guanine. The particular pattern of

these base pairs dictates an individual's genetic characteristics.

Most of a DNA molecule is the same from person to person. DNA

profiling focuses on those parts of the DNA molecule where there is

a significant variation of a base pair pattern. The areas of

significant variation are referred to as "polymorphic," and base

pair patterns in polymorphic areas are called "alleles." There are

approximately 3 million distinguishable polymorphic sites between

individuals. Although an examination of all of these polymorphic

sites is not currently feasible, an examination of a small number

of polymorphic sites can establish a DNA profile which can be

compared to that from another DNA sample.

     Restriction Fragment Length Polymorphism is a six-step process

which allows an analyst to physically see the results of a DNA

profile in the form of bands. Since the length of polymorphic DNA

fragments differs between individuals, individuals also tend to

have different positioning of their bands on a DNA print, called an

autoradiograph or autorad. An analyst makes a visual comparison of

DNA band patterns to determine whether known and unknown DNA

samples came from the same source, whether the samples did not come

from the same source or whether the comparison was inconclusive. If

an unknown DNA sample has not been excluded from a comparison, a

computerized measurement program is used to compare the lengths of

the DNA fragments. If the DNA band patterns fall within a certain

range, the samples are declared a match.

     For a match to be meaningful, a statistical analysis is

required. The statistical analysis determines the frequency in

which a match would occur in a database population. In this case,

Frank used the fixed bin method of determining the frequency of an

occurrence. The process of binning is a way of counting or grouping

bands and determining the frequency of the bands. The Hardy-

Weinberg Equilibrium is used to determine the frequency of a

particular band combination. Stated simplistically, the frequency

of one band is multiplied by the frequency of a second, and so on.

The product from this calculation is then multiplied by two to

account for an individual inheriting one strand of DNA from his

mother and one strand from his father. This result constitutes the

statistical frequency of a match within a certain population. This

process of binning and determining the frequency is also known as

the product rule.

     We turn first to defendant's allegation that the trial court

erred in qualifying Frank as an expert in DNA. Whether an

individual is an expert on a particular subject is a matter

generally reserved to the sound discretion of the trial court.

Schaffner v. Chicago & North Western Transportation Co., 129 Ill.

2d 1, 36 (1989). An individual will be allowed to testify as an

expert if his experience and qualifications afford him knowledge

which is not common to laypersons, and where such testimony will

aid the trier of fact in reaching its conclusions. People v. Novak,

163 Ill. 2d 93, 104 (1994). An expert need only have knowledge and

experience beyond that of the average citizen. Novak, 163 Ill. 2d

at 104. There is no predetermined formula for how an expert

acquires specialized knowledge or experience and the expert can

gain such through practical experience, scientific study,

education, training or research. Novak, 163 Ill. 2d at 104.

     In the instant case, the trial court did not abuse its

discretion in concluding that Frank was an expert on issues

involving DNA. The record reveals that through education, training,

research and experience, Frank possessed knowledge which was not

common to the average citizen. Frank had a bachelors degree in

chemistry and biology and was working toward his masters degree in

biology with his thesis being on DNA extraction methods. Frank had

taken several genetics courses and had attended seminars and

classes on DNA methods at both the FBI and private laboratories. He

has been certified by the American Board of Criminalistics and has

been subject to periodic testing on DNA issues. Thus, the trial

court did not abuse its discretion in allowing Frank to testify.

     Since Frank was competent to testify as an expert, we must

next consider whether the trial court properly admitted the DNA

evidence. Before this court defendant argues that the trial court

erred in admitting the DNA evidence in light of Watson, which he

claims requires a finding that thee DNA evidence was inadmissible.

Defendant further asserts that Frank's testimony and methodology

were not valid because the DNA testing was done by the Illinois

State Police lab rather than by the FBI or a private lab and by a

person with only a bachelors degree rather than a doctorate.

     The decision of whether to admit expert testimony about a new

scientific technique is committed to the sound discretion of the

trial court. People v. Eyler, 133 Ill. 2d 173, 212 (1989). Illinois

follows the Frye standard for the admission of novel scientific

evidence. People v. Baynes, 88 Ill. 2d 225, 241 (1981) (discussing

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). Frye requires

that the evidence be generally accepted in the relevant scientific

community before it can be admitted. People v. Thomas, 137 Ill. 2d

500, 517 (1990).

     We disagree with the defendant's contention that the trial

court erred in admitting the DNA evidence. Based on the

documentation the trial court had before it--Frank's testimony and

the five Illinois appellate court cases--the trial court did not

abuse its discretion in relying on the cases which supported the

use of the RFLP technique and the product rule. We note that the

defendant was provided access to his own DNA expert, but defendant

did not present any testimony which contradicted Frank's testimony.

The defendant was provided ample opportunity to cross-examine Frank

regarding the procedures he used in conducting the RFLP analysis

and in calculating the frequency with which the DNA samples matched

in this case. Frank testified that the procedures he used were the

same as those used by the FBI. The trial court did not abuse its

discretion by relying on the four favorable cases and Frank's

testimony rather than relying on Watson in making its decision.

     We also note that the majority of courts deciding the issue of

the admissibility of evidence on the six-step RFLP process have

found such evidence to be admissible under several standards of

admissibility, including Frye and Daubert. See, e.g., Harmon v.

State, 908 P.2d 434, 440 (Ala. 1995); Taylor v. State, 889 P.2d

319, 333 (Okla. App. 1995); State v. Cauthron, 120 Wash. 2d 879,

896-97, 846 P.2d 502, 511 (1993) (citing 15 cases which support

general acceptance of RFLP testing); United States v. Porter, 618

A.2d 629, 636 (D.C. App. 1992). There is little question that the

RFLP technique itself is generally accepted in the relevant

scientific community.

     Further, while there has been some controversy over the use of

the product rule in calculating the frequency of a DNA match, that

controversy appears to be dissipating. Some members of the

scientific community originally argued that the product rule is

flawed because it assumes that DNA fragments revealed by the DNA

processing occur independently and that members of the racial

groups represented by a database intermix within their groups at

random without regard to religion, ethnicity or geography. Watson,

257 Ill. App. 3d at 930 (discussing R. Lewontin & D. Hartl,

Population Genetics in Forensic DNA Typing, Science, at 1745

(December 20, 1991)). Lewontin and Hartl maintained that reference

to a broad database to calculate the frequency of matches is

inappropriate because subgroups of individuals may have substantial

differences in the frequency of a given DNA fragment. Watson, 257

Ill. App. 3d at 930. In fact, the court in Watson agreed with these

critics and determined that a jury could not be given DNA

statistical evidence which was based on the product rule. Watson,

257 Ill. App. 3d at 933.

     Since the time of the pretrial hearing in this case, the

scientific and legal status of the product rule has continued to

evolve. The concerns enunciated by Lewontin and Hartl appear not to

have been borne out by empirical studies. See Lander and Budowle,

DNA Fingerprinting Dispute Laid to Rest, Nature, at 735 (October

27, 1994) (criticizing Lewontin & Hartl's subgroup analysis). The

most recent courts to consider the use of the product rule have

concluded that it is a generally accepted statistical method for

estimating the frequency of a DNA match. See, e.g., People v.

Chandler, 211 Mich. App. 604, 610-11, 536 N.W.2d 799, 803 (1995);

People v. Wilds, 40 Cal. App. 4th 166, 180-82, 37 Cal. Rptr. 2d

351, 359-60 (1995); Taylor, 889 P.2d at 336-37; Lindsey v. People,

892 P.2d 281, 293-94 (Colo. 1995) (discussing in detail the

findings of Lander and Budowle); People v. Soto, 39 Cal. App. 4th

757, 775-78, 35 Cal. Rptr. 2d 846, 857-59 (1994). Therefore, it is

evident that given the testimony the trial court had before it and

the current level of acceptance of the RFLP process and the

statistical analysis, the trial court did not abuse its discretion

in allowing Frank to testify regarding the DNA evidence.

                         Evidence of Other Crimes

     First, the defendant claims that the trial court erred in

failing to sustain an objection to Detective Rabe's testimony

regarding the defendant's statements that he dumped the bodies at

different times and that he dumped them in such a manner that they

would not be found. Defense counsel objected to Rabe's testimony on

the basis that the jury would assume the defendant's statements

were relevant to the instant case when, in fact, the statements

could have been about the murder of Faggott, a murder in Missouri,

or the murders the defendant committed in the 1970s. Defense

counsel asserted that immediately before Rabe questioned the

defendant regarding the two bodies, Rabe and the defendant had been

discussing Faggott's murder.

     The defendant now claims that he was prejudiced at trial

because the State did not link his "dumping" statements to the

victims in the instant case. The defendant's argument is without

merit as a review of the record evidences that throughout the

detectives' entire interview of the defendant, including the car

ride, they were discussing the three women, although the

questioning may have also focussed on Faggott. The defendant's

statements were made at Cameron Lane where the two bodies were

recovered and not at the sheriff's department. The 1977 murders had

not been mentioned. In addition, the defendant specifically

referred to two bodies, not the single body of Faggott or a single

body in Missouri. Thus, it is evident that the defendant was

speaking of the instant victims and not any others. The trial court

did not err in failing to sustain defense counsel's objection to

Rabe's testimony.

     Second, the defendant contends that the evidence regarding his

possession of the maroon Oldsmobile was improperly admitted as it

showed that he had a criminal propensity. The defendant argues that

the State should have limited its evidence to the simple fact that

defendant was seen in the car on several occasions. He argues that

(1) the testimony of McGovern, Decher and Mayes regarding his

possession of the maroon Oldsmobile, (2) the testimony of Voight

regarding his entrance into Faggott's home, and (3) the testimony

of Hall regarding his introduction to Faggott were improper because

the testimony implicated him in Faggott's murder. Defendant also

argues that even if the jury could not have inferred from the

testimony that he murdered Faggott, the jury at least could have

inferred that he stole her car or burglarized her residence.

     The defendant has waived any claims that McGovern, Decher and

Mayes' testimony implied that he had committed a crime involving

Faggott, her car or her home by failing to object to the testimony

at trial as evidence of other crimes. Defense counsel objected to

the testimony of McGovern, Decher and Mayes on the basis of lack of

foundation (Mayes and Decher) and hearsay (McGovern and Decher). It

is axiomatic that a defendant must make a timely objection at trial

and must renew the ground for objection in a written post-trial

motion to preserve an alleged error for review. People v. Enoch,

122 Ill. 2d 176, 186 (1988). Objections at trial on specific

grounds waive all other grounds of objection. People v. Barrios,

114 Ill. 2d 265, 275 (1986). Thus, the defendant has waived the

right to object on the grounds he asserts on appeal.

     Nor will we consider the defendant's arguments regarding this

testimony under the plain error doctrine. 134 Ill. 2d R. 615(a).

The plain error doctrine allows a reviewing court to consider a

trial error not properly preserved when (1) the evidence in a

criminal case is closely balanced or (2) the error is so

fundamental and of such a magnitude that the defendant was denied

his right to a fair trial. People v. Byron, 164 Ill. 2d 279, 293

(1995); People v. Herrett, 137 Ill. 2d 195, 209-10 (1990). Neither

circumstance applies in this case.

     Defendant's next contention involves Voight's testimony.

Outside the presence of the jury and before Voight's testimony,

defense counsel claimed that Voight's testimony would be

prejudicial to the defendant, as it linked the defendant to

Faggott. The trial judge required an offer of proof and then

determined that Voight could testify about seeing the defendant

approach Faggott's home on a bicycle and enter her home through a

screened-in porch. The trial court did not err in allowing Voight's

testimony since the testimony was not prejudicial and the testimony

did not imply that the defendant committed a crime involving

Faggott. Prior to Voight's testimony, there had been other

testimony that the defendant had been introduced to Faggott.

Voight's testimony simply emphasized that the defendant knew

Faggott and potentially had access to her car. We note that Voight

did not testify that he saw the defendant drive off in Faggott's

car or leave her home with any items.

     In addition, defense counsel did not object to Hall's

testimony and, thus, the defendant cannot now claim any error

regarding the testimony. Enoch, 122 Ill. 2d at 186. Regardless,

Hall's testimony was not prejudicial to the defendant, as it merely

related that the defendant knew Faggott in July 1993.

     Finally, the defendant also asserts that Deputy Taylor's

testimony that defendant questioned her regarding the difference

between state and federal crimes was improper. The defendant

asserts that Taylor's testimony implied that he had committed a

crime other than the three murders for which he was on trial.

Taylor's testimony was not improper. She did not testify that the

defendant had been convicted of other crimes or was under

investigation for other crimes, state or federal. Testimony by a

witness of her mere explanation to the defendant of the difference

between state and federal crimes without more does not imply to the

jury that the defendant had committed crimes other than the ones

for which he was on trial. Thus, the defendant was not prejudiced

by Taylor's testimony and the trial court did not err in allowing

such testimony.

                             Hearsay Testimony

     Defendant claims that the testimony of Mayes, Decher and

McGovern that defendant told each of them that he was transporting

the maroon Oldsmobile for a dealership or had borrowed the car from

a friend was inadmissible hearsay. At trial, defense counsel did

not object to Mayes' testimony on the basis of hearsay nor were any

issues regarding Mayes' testimony raised in the post-trial motion.

Thus, defendant has waived any hearsay claims regarding this

testimony. Enoch, 122 Ill. 2d at 186.

     With regard to Decher's testimony, defense counsel objected on

the basis of hearsay before Decher testified that defendant told

her he was transporting the car for a dealership. Defense counsel

also objected on the basis of hearsay before McGovern testified

that defendant told him the car belonged to a friend. However, the

defendant did not raise as error in his post-trial motion the trial

court's failure to sustain the objections to Decher's and

McGovern's testimony. Rather, defendant claimed in his post-trial

motion that Decher's and McGovern's testimony should have been

excluded on the basis that it was evidence of other crimes. Such a

claim is not sufficient to preserve the prior objection that the

testimony should have been excluded because it was hearsay. Thus,

defendant has waived this issue. Enoch, 122 Ill. 2d at 186. In

addition, we decline to consider defendant's hearsay challenge to

the testimony of Mayes, Decher and McGovern under the plain error

doctrine, as the evidence in this case was not closely balanced and

any alleged error was not so fundamental as to deny the defendant

his right to a fair trial. Byron, 164 Ill. 2d at 293.

             Admission of Testimony Regarding Women's Clothing

     The defendant argues that the trial court erred in allowing

Officer Molleck of the Peoria County sheriff's department to

testify regarding several garments he collected from the

defendant's apartment. The garments included two robes and women's

underwear. Defense counsel objected to the admission of such

testimony, arguing that its prejudice outweighed its probative

value. The objection was overruled and the officer was allowed to

testify about his discoveries. We note that the garments were not

admitted into evidence and were not shown to the jury. On appeal,

defendant asserts that the testimony regarding these items was not

relevant to his prosecution, as the garments had not been linked to

any of the three victims. The State counters that the testimony was

relevant as it made it more probable than not that the defendant

killed the three women.

     Questions concerning the admission of evidence are within the

discretion of the trial court. People v. Fierer, 124 Ill. 2d 176,

195 (1988). For physical evidence to be admitted, the physical

evidence must be connected to both the crime and the defendant.

People v. Miller, 40 Ill. 2d 154, 159 (1968). Likewise, testimony

regarding physical evidence is not proper unless that testimony

links the physical evidence to both the defendant and the crime.

     In the instant case, the undergarments were connected to the

defendant, as they were found in his apartment. However, the

evidence presented at trial never linked the women's undergarments

to any of the three victims. The State did not lay a foundation

which showed the undergarments were the women's personal property.

Thus, the trial court abused its discretion in allowing Officer

Molleck to testify about the undergarments. Such an abuse of

discretion, however, was harmless error in light of the

overwhelming evidence of defendant's guilt. People v. Carlson, 92

Ill. 2d 440, 449 (1982) (evidentiary errors are harmless if

properly admitted evidence is so overwhelming that no fair-minded

juror could reasonably have voted to acquit the defendant).

                        CAPITAL SENTENCING HEARING

                          Prosecutorial Comments

     The defendant asserts that the prosecutor's rebuttal argument

during the second stage of the capital sentencing hearing

improperly diminished the jury's sense of responsibility for

imposing the death penalty. The defendant points to the

prosecutor's statement:

               "And this person [defendant] fits the law and the

          evidence that you have heard both at the trial and at the

          hearing, a 158 days after he came out from the very place

          they want to put him back into does not in any manner

          justify a sentence not of death, but simply fits the bill

          of a person who has brought himself here and should be

          sentenced under the laws of Illinois to death."

To support his argument, the defendant relies on Caldwell v.

Mississippi, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633

(1985). In Caldwell, the Supreme Court found constitutional error

in the prosecutor's argument that the jury's decision to impose

death was not final and was automatically reviewable by the state

supreme court. The Supreme Court held that the prosecutor's

argument violated the eighth amendment by leading the sentencer to

believe that responsibility for determining the appropriateness of

the defendant's death rested elsewhere. Caldwell, 472 U.S. at 328-

39, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.

     A review of the instant record evidences that the prosecutor

did not cause the jury to feel less responsible for its decision.

The prosecutor did not suggest to the jurors that they were

relieved of their responsibility for sentencing the defendant by

either the defendant's own actions or the ability of the defendant

to seek review of the jury's decision. See People v. Page, 155 Ill.

2d 232, 281 (1993). In addition, the jury instructions adequately

set forth the jury's role in imposing the death penalty and the

jury was instructed that closing arguments were not to be

considered as evidence. See also People v. Moore, 171 Ill. 2d 74,

116 (1996); People v. Pasch, 152 Ill. 2d 133, 204-06 (1992).

     The defendant also points to two other comments by the

prosecutor during his rebuttal argument which allegedly suggested

that the decision of whether to impose the death penalty was not "a

vote to kill." The defendant asserts that such comments violated

Caldwell because they diminished the jury's responsibility by

saying a vote in favor of death was not a vote to kill. The

comments by the prosecution were in response to defense counsel's

urging the jury to elect not to vote to kill, to vote against

killing the defendant and to value the sanctity of human life. We

find that the prosecutor's comments did not violate Caldwell and

did not deprive defendant of a fair sentencing hearing.

                             Jury Instructions

     The defendant first argues that the trial court erred in

refusing to give a proposed instruction which stated:

               "You need not unanimously agree on the existence of

          the mitigating factor in order for a juror to consider

          that mitigating factor in his or her deliberations."

The defendant relies on the case of Mills v. Maryland, 486 U.S.

367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988), and asserts that

the instructions the jury was given did not preclude the jury from

believing that it had to unanimously find that a mitigating factor

existed before it could determine whether the factor was sufficient

to prevent a death sentence.

     The Supreme Court in Mills reviewed a capital case where the

verdict form contained a list of mitigating circumstances,

accompanied by spaces in which the jury could check "yes" or "no"

and preceded by a statement that the jury "UNANIMOUSLY find[s] that

each of the following mitigating circumstances which is marked

`yes' has been proven to exist." (Emphasis added.) Mills, 486 U.S.

at 384-89, 100 L. Ed. 2d at 400-03, 108 S. Ct. at 1870-72. The

verdict form further asked the jury to affirm or deny that it

unanimously found that the mitigating circumstances marked "yes"

outweighed the aggravating circumstances. The trial court's

instructions to the jury emphasized the unanimity requirement. The

Supreme Court determined that the verdict form and the instructions

violated the Constitution since the jury could have interpreted

them as precluding the consideration of all possible mitigating

evidence. Mills, 486 U.S. at 375, 100 L. Ed. 2d at 394, 108 S. Ct.

at 1865-66. Later, the Supreme Court applied the Mills decision to

overturn a death sentence entered in a case where the sentencing

jury was instructed not to consider any mitigating factor which the

jury did not "unanimously" find to exist. McKoy v. North Carolina,

494 U.S. 433, 442-44, 108 L. Ed. 2d 369, 380-81, 110 S. Ct. 1227,

1233-34 (1990).

     As background, the Illinois death penalty statute does not

require the jury to reach unanimous agreement as to the existence

of any mitigating factors before the jury can decide not to impose

the death penalty. People v. Ramey, 152 Ill. 2d 41, 77 (1992). In

People v. Hope, 168 Ill. 2d 1, 45 (1995), this court discussed the

application of Mills and McKoy to a capital case where the jury was

instructed with regard to mitigation as follows:

               "If you unanimously find from your consideration of

          all the evidence that there are no mitigating factors

          sufficient to preclude imposition of a death sentence,

          then you should sign the verdict requiring the court to

          sentence the defendant to death.

               If you do not unanimously find from your

          consideration of all the evidence that there are no

          mitigating factors sufficient to preclude imposition of

          a death sentence, then you should sign the verdict

          requiring the court to impose a sentence other than

          death."

This court found that these instructions did not convey the

impression to the jury that unanimity was required before a

mitigating factor could be considered. Hope, 168 Ill. 2d at 45.

These instructions and the closing argument by defense counsel, who

argued that each juror had the power to give death and the

opportunity to give life, adequately informed the jury that

unanimity was not required to find a mitigating factor sufficient

to preclude death. Hope, 168 Ill. 2d at 45.

     In the present case, the jury was given the same instructions

as the jury in Hope. In addition, during closing argument, defense

counsel repeatedly stressed that each juror had the power to

prevent the imposition of the death sentence. Accordingly, we

conclude that the jury was properly and sufficiently instructed

regarding the consideration of mitigating factors. The trial court

acted within its discretion and did not err in refusing the

defendant's request for an instruction on the lack of a unanimity

requirement in finding mitigating factors.

     The defendant next argues that the trial court erred in

refusing to give a proposed instruction which stated:

               "In deciding whether the defendant should be

          sentenced to death, however, you are not prevented from

          considering any feelings or mercy or compassion you wish

          to extend toward the defendant."

     A similar argument was raised and rejected in People v.

Sanchez, 115 Ill. 2d 238, 269-70 (1986). See also People v. Fields,

135 Ill. 2d 18, 74 (1990); People v. Stewart, 104 Ill. 2d 463, 492-

93 (1984). In Sanchez, the defendant sought an instruction which

stated that the jury could "extend mercy to the defendant." This

court upheld the trial court's refusal to tender such an

instruction on the basis that the jury was instructed that it could

consider "any other mitigating factor" and defense counsel

presented mitigation evidence and argued for mercy in his closing

statement. Sanchez, 115 Ill. 2d at 269-70.

     The rationale of Sanchez equally applies to the instant case.

Although the trial court refused the defendant's proposed

instruction, the jury was given an instruction which allowed it to

consider as a mitigating factor "any other reason supported by the

evidence why the defendant should not be sentenced to death."

Further, the defendant was allowed to present mitigating evidence,

and defense counsel argued for mercy in his closing remarks. Thus,

the jury was in a position to consider mercy, or any other

mitigating factor, as it saw fit. Thus, the trial court did not err

in refusing to give the proposed instruction.

     The defendant finally argues that the jury instructions given

at his sentencing hearing were unconstitutional in that they failed

to guide the jury's discretion. As support for his argument, the

defendant cites United States ex rel. Free v. Peters, 806 F. Supp.

705 (N.D. Ill. 1992). The decision of the Free case has been

reversed and its reasoning rejected. Free v. Peters, 12 F.3d 700

(7th Cir. 1993). This court has found the decision of the Seventh

Circuit Court of Appeals to be sound (People v. Franklin, 167 Ill.

2d 1, 29 (1995); People v. Kokoraleis, 159 Ill. 2d 325, 333-34

(1994)) and has criticized the reasoning on which the district

court relied (People v. Towns, 157 Ill. 2d 90, 115 (1993)). Thus,

we reject the defendant's argument.

                  Constitutionality of the Death Penalty

     The defendant raises several challenges to the

constitutionality of the Illinois death penalty statute (720 ILCS

5/9--1 (West 1992)). This court has previously considered and

rejected the arguments which defendant now raises. The defendant

has not presented us with any reasons to reach a different result

at this time.

     The defendant first claims that the death penalty statute

violates the eighth and fourteenth amendments because it places a

burden of proof on defendant which precludes a sentencer from

giving meaningful consideration to mitigation evidence. This court

has stated that the death penalty statute does not

unconstitutionally cast on a defendant the burden of establishing

that a sentence other than death should be imposed. People v.

Mahaffey, 166 Ill. 2d 1, 34 (1995); People v. Hampton, 149 Ill. 2d

71, 116-17 (1992); People v. Simms, 143 Ill. 2d 154, 184 (1991). In

addition, the statute does not preclude a sentencer from giving

meaningful consideration to mitigation evidence. People v. Page,

155 Ill. 2d 232, 283 (1993); People v. Strickland, 154 Ill. 2d 489,

538-39 (1992).

     In a related argument, the defendant asserts that the statute

is unconstitutional because it allows the sentencer to consider a

vague aggravating factor: namely, "any other reason" (Illinois

Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992)) a

defendant should be sentenced to death. This court has consistently

rejected the argument that a sentencer's consideration of

nonstatutory aggravating factors during the second stage of a

capital sentencing hearing results in the arbitrary imposition of

the death sentence. People v. Taylor, 166 Ill. 2d 414, 439 (1995);

People v. Neal, 111 Ill. 2d 180, 203 (1985); People v. Madej, 106

Ill. 2d 201, 211 (1985).

     Finally, the defendant asserts that the death penalty statute

is unconstitutional because it does not sufficiently minimize the

risk of the imposition of an arbitrary and capricious death

sentence. The defendant asks this court to reconsider many of its

prior rulings regarding the statute and to consider whether the

cumulative effect of all features of the statute render the statute

unconstitutional. This argument has been considered and rejected by

this court on numerous occasions. See, e.g., People v. Edgeston,

157 Ill. 2d 201, 247 (1993); Thomas, 137 Ill. 2d at 549-50; People

v. Phillips, 127 Ill. 2d 499, 542-43 (1989). The defendant has

failed to provide any citation or argument in support of his

request. The defendant's arguments are not compelling, and we

decline to review the defendant's request.

                                CONCLUSION

     For the reasons stated, the judgment of the circuit court of

Peoria County is affirmed. The clerk of this court is directed to

enter an order setting Tuesday, November 19, 1996, as the date on

which the sentence of death entered by the circuit court of Peoria

County shall be carried out. Defendant shall be executed in a

manner provided by the law. 725 ILCS 5/119--5 (West 1992). The

clerk of this court shall send a certified copy of the mandate in

this case to the Director of Corrections, to the warden of

Stateville Correction Center, and to the warden of the institution

where defendant is now confined.

Affirmed.

                                                                         

     JUSTICE McMORROW, specially concurring:

     I agree that defendant's conviction and sentence of death

should be affirmed. I write separately because I believe the

majority has erred in its analysis of the trial court's decision to

admit the DNA evidence at defendant's trial. Specifically, while

the majority states that it is within the discretion of the trial

court to determine that a novel scientific technique has gained

general acceptance in the relevant scientific community as required

for admissibility under the Frye standard (see Frye v. United

States, 293 F. 1013 (D.C. Cir. 1923); People v. Thomas, 137 Ill. 2d

500, 517 (1990)), and that this determination will not be reversed

absent an abuse of discretion (see People v. Eyler, 133 Ill. 2d

173, 212 (1989)), the majority has not, in fact, applied such a

standard of review in the case at bar. The majority's analysis is

thus inherently contradictory, and can only serve to exacerbate the

confusion in our appellate court regarding the proper standard of

review to apply against trial court decisions admitting or

excluding novel scientific evidence (compare People v. Heaton, 266

Ill. App. 3d 469, 476-78 (5th Dist. 1994) (trial court's decision

that novel scientific technique is generally accepted in the

relevant scientific community is reviewed under traditional abuse

of discretion standard), with People v. Watson, 257 Ill. App. 3d

915, 923-24 (1st Dist. 1994) ("broad review" may be applied to

trial court's determination regarding general acceptance of new

scientific technique)).

     An abuse of discretion occurs only where the trial court's

ruling is against the manifest weight of the evidence. Mizell v.

Passo, 147 Ill. 2d 420, 425 (1992). By definition, then, a

reviewing court may not conclude that a trial court has abused its

discretion, or acted within that discretion, based on evidence that

was never presented at trial. See Heaton, 266 Ill. App. 3d at 478

("Under [the abuse of discretion standard], we must look at the

state of the record as it existed in the trial court at the time

the trial court made its determination"). However, that is exactly

what the majority has done in the instant case. In its discussion

regarding the admissibility of the DNA evidence, the majority cites

to a recent scientific article and several court opinions from

other jurisdictions. Both the article and the court opinions

conclude that any lingering controversy surrounding the reliability

of forensic DNA analysis has abated and, in particular, that the

statistical techniques which were employed by the State's expert

witness in the case at bar are now generally accepted in the

relevant scientific community. Neither the article nor the court

opinions were part of the record before the trial court. Slip op.

at 10. Nevertheless, the majority concludes that "given the

testimony the trial court had before it AND THE CURRENT LEVEL OF

ACCEPTANCE OF THE RFLP PROCESS AND THE STATISTICAL ANALYSIS, the

trial court did not abuse its discretion in allowing [the State's

expert] to testify regarding the DNA evidence." (Emphasis added.)

Slip op. at 15.

     The majority cannot have it both ways. If trial court

decisions concerning the general acceptance of novel scientific

evidence cannot be reversed absent an abuse of discretion, then

upon review, only material which was part of the trial record

should be considered by this court. See Heaton, 266 Ill. App. 3d at

478. If, on the other hand, the majority believes that it is proper

to rely on scientific articles and court cases which were not part

of the trial record to determine whether a novel scientific

technique has become generally accepted in the relevant scientific

community, then the majority must acknowledge that the standard of

review is not a simple abuse of discretion standard (see Watson,

257 Ill. App. 3d at 923-24).

     I believe that the better approach is to recognize that this

court may rely on materials which were not part of the trial record

to determine whether a scientific technique is generally accepted

in the relevant scientific community. In People v. Eyler, 133 Ill.

2d 173, 212 (1989), this court, sua sponte and without significant

analysis, concluded that trial court decisions regarding the

admission of novel scientific evidence should be reviewed for an

abuse of discretion. I submit that the all-encompassing abuse of

discretion standard adopted in Eyler does not permit a reviewing

court to adequately address the legal issues raised by trial court

applications of the Frye standard. What is needed instead is a

mixed standard of review. Trial court decisions regarding whether

an expert scientific witness is qualified to testify in a subject

area, and whether the proffered testimony is relevant in a

particular case, should be left to the sound discretion of the

trial court. However, trial court decisions regarding the threshold

question of whether a scientific technique has achieved general

acceptance in the relevant scientific community should be subject

to de novo review. This de novo review should not be limited to the

trial record, but should permit the appellate court, where

appropriate, to rely on sources outside the record, including legal

and scientific articles, as well as court opinions from other

jurisdictions to determine the issue of general acceptance in the

relevant scientific community.

     There are good reasons why the determination of general

acceptance in the scientific community should not be left to the

discretion of the trial court. Foremost is the fact that the

general acceptance issue transcends any particular dispute. As one

court has put it, "[t]he question of general acceptance of a

scientific technique, while referring to only one of the criteria

for admissibility of expert testimony, in another sense transcends

that particular inquiry, for, in attempting to establish such

general acceptance for purposes of the case at hand, the proponent

will also be asking the court to establish the law of the

jurisdiction for future cases." Jones v. United States, 548 A.2d

35, 40 (D.C. App. 1988). Application of less than a de novo

standard of review to an issue which transcends individual cases

invariably leads to inconsistent treatment of similarly situated

claims. Compare Heaton, 266 Ill. App. 3d 469, with Watson, 257 Ill.

App. 3d 915. The general acceptance of a scientific technique does

not change from one courtroom to another; assessments of that

general acceptance also should not change from court to court. See

Jones, 548 A.2d at 40 (and cases cited therein); Watson, 257 Ill.

App. 3d at 923-24; State v. Vandebogart, 136 N.H. 365, 616 A.2d 483

(1992); Taylor v. State, 889 P.2d 319, 332 (Okla. Crim. App. 1995);

see also Commonwealth v. Lanigan, 413 Mass. 154, 158, 596 N.E.2d

311, 314 (1992).

     In addition, a de novo standard of review which permits

reliance on materials outside the trial record is not, in this

context, problematic. Under the Frye standard, the trial court is

not asked to determine the validity of a particular scientific

technique. Rather, the court's responsibility is to determine the

existence, or nonexistence, of general consensus in the relevant

scientific community regarding the reliability of that technique.

"Accordingly, because the focus is primarily on counting

scientists' votes, rather than on verifying the soundness of a

scientific conclusion, there will not be the concerns about witness

credibility and hearsay normally associated with citations to

empirical or scientific studies whose authors cannot be observed or

cross-examined." Jones, 548 A.2d at 42; see also Note, Daubert v.

Merrell Dow Pharmaceuticals: Pushing the Limits of Scientific

Reliability--The Questionable Wisdom of Abandoning the Peer Review

Standard for Admitting Expert Testimony, 47 Vand. L. Rev. 1175,

1196 (1994) (under the Frye standard, "the appellate court [can]

take its own head count of experts and determine the extent to

which a scientific method [is] accepted").

     Moreover, there is nothing particularly novel about the de

novo standard of review proposed here. Indeed, in several previous

decisions regarding the acceptance of scientific techniques,

including Eyler itself, this court has engaged in precisely this

type of review. See Eyler, 133 Ill. 2d at 213-15 (citing court

decisions from other jurisdictions to support the conclusion that

electrophoretic testing of dried blood is generally accepted in the

scientific community); People v. Zayas, 131 Ill. 2d 284 (1989)

(holding inadmissible hypnotically induced testimony of a witness

other than the defendant and citing to scientific articles, law

reviews and court opinions from other states); People v. Baynes, 88

Ill. 2d 225, 234-45 (1981) (citing law reviews, scientific articles

and court decisions from other jurisdictions to support holding

that polygraph evidence is inadmissible); People v. Keith, 148 Ill.

2d 32, 43-45 (1992) (suppressing results of breath test and citing

to a law review, a treatise and a court opinion from another

jurisdiction in discussion of the proper procedures for operating

a breathalyzer). See also 2 K. Davis & R. Pierce, Administrative

Law Treatise §10.5 (3d ed. 1994) (describing the long tradition of

courts relying on sources outside the record for "legislative"

facts, i.e., facts that help the tribunal decide questions of law

and policy); New York v. Ferber, 458 U.S. 747, 758 n.9, 73 L. Ed.

2d 1113, 1123 n.9, 102 S. Ct. 3348, 3355 n.9 (1982) (citing

literature describing the effect on children of being a subject in

pornographic materials); People v. McCarty, 86 Ill. 2d 247, 255-57

(1981) (concluding that the legislature had a rational basis for

statutorily classifying cocaine as a "narcotic" drug, based, in

part, on a review of scientific literature).

     Of course, when a reviewing court relies on materials which

are not in the trial record--especially court opinions from other

jurisdictions--to resolve the general acceptance question, care

must be taken so that the practice is not abused. For "[u]nless the

question of general acceptance has been thoroughly litigated in the

previous cases, *** reliance on judicial practice is a hollow

ritual." 2 J. Strong, McCormick on Evidence §203, at 870 n.20 (4th

ed. 1992); see also State v. Cauthorn, 120 Wash. 2d 879, 888-89,

846 P.2d 502, 506 (1993) (decisions from other jurisdictions may be

examined but relevant inquiry is the general acceptance by

scientists, not by the courts). However, in the instant case, given

the expert testimony of record and the clear consensus evident from

the material cited by the majority (see slip op. at 14-15), I have

no difficulty in concluding that the DNA techniques employed by the

State's expert are, in fact, generally accepted in the relevant

scientific community.

     Determining the appropriate standard of review for decisions

regarding the admission of novel scientific evidence is more than

an idle academic exercise. In certain cases, the standard of review

may play a crucial, if not determinative role, in deciding the

outcome of the case. See, e.g., Heaton, 266 Ill. App. 3d 469. While

the majority's decision today settles the ultimate question

regarding the admissibility of DNA evidence, that result has

unfortunately come at the expense of logic and clarity.