THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STUART HEATON, Defendant-Appellant.

Fifth District    No. 5—92—0573

Opinion filed September 13, 1994.

470

RARICK, J., dissenting.

Robert L. Byman and S. Michelle Malinowski, both of Jenner & Block, of Chicago, for appellant.

Rod Irvin, State's Attorney, of Vandalia (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

A jury convicted defendant, Stuart Heaton, of murder in the stabbing death of Krystal Naab. He was sentenced to life imprisonment. Defendant raises four issues for our review: (1) whether the trial court erred in admitting DNA evidence implicating defendant in the crime; (2) whether the circuit court erred in allowing autopsy photographs of the victim to go to the jury room; (3) whether the

prosecutor, in his opening and closing arguments, improperly referred to defendant's silence; and (4) whether the evidence was sufficient to convict defendant. We affirm defendant's conviction and sentence.

Upon returning home from work at approximately 4 or 4:30 p.m. on July 23, 1991, Curtis Naab found his 16-year-old sister, Krystal, lying in a pool of blood in the living room of the trailer where he, Krystal, and their mother, Helen, lived. After unsuccessfully trying to revive Krystal, Curtis drove to a neighbor's home to summon help. Ultimately, defendant was charged with Krystal's murder.

At trial, Curtis Naab testified that he was 22 years old and had known defendant in high school. Since then, he had had only occasional contact with defendant. Curtis testified that defendant had been to the Naab residence a couple of times. Curtis also testified that he had seen defendant driving a white Dodge Dakota pickup truck five to six times during the previous year. Curtis was shown photographs of defendant's pickup truck which depict a 1989 white Dodge Dakota pickup truck with distinctive hubcaps, running boards, and two white tool boxes, each of which is five to six feet long and runs the entire length of the bed of the truck. The photographs also depict a third (black) tool box, smaller in size and wedged between the two white tool boxes immediately under the window of the truck. All the tool boxes are removable. Curtis did not remember whether the tool boxes were in the truck when he had previously seen it.

Helen Naab identified State's exhibit No. 6, a pair of pink-handled scissors which were found by the kitchen sink on the day of the murder, as one of two pairs she kept in the living room china cabinet.

Gary Blurton, the Fayette County coroner, testified that when he arrived at the Naab residence, he found Krystal lying on her back in the living room, surrounded by blood. Blurton saw several stab or puncture wounds in the neck and chest area. He found no pulse and pronounced Krystal dead. Blurton walked into the kitchen and saw a pair of mauve-colored scissors lying by the sink. The scissors were covered by a dark stain or discoloration. The phone was lying on the floor. Blurton testified that while he and Sheriff Kleinik waited for the crime scene technicians, the Naabs' neighbor, Cavit Cooley, told them that he had seen a small white pickup truck with odd-shaped hubcaps parked at the Naab trailer around 12:30 p.m. that day.

Sergeant Steven Poe, an agent with the Illinois State Police, Division of Criminal Investigation, testified that Heaton became a suspect in the case when several people came forward and told authorities that they saw a small white pickup truck at the Naabs' trailer on the day of the murder. A search of defendant's residence

and pickup truck produced no incriminating evidence. Defendant's blood, hair, and fingerprints were taken for forensic purposes. Photographs of the defendant taken that evening show numerous, small lacerations on his hands.

Dr. Beverly Tsai, certified in anatomical and clinical pathology, conducted the autopsy on Krystal Naab. Dr. Tsai testified that Krystal bled to death as a result of 81 stab wounds over her neck, chest, back, thighs, arms, and hands. Dr. Tsai characterized 26 of the 81 wounds as deep, major wounds and testified that scissors were consistent with the type of injury inflicted on Krystal. The doctor opined that the small scratches and superficial cuts on Krystal's hands and arms were defensive wounds, inflicted when Krystal attempted to fend off her attacker.

Dr. Tsai also opined that the superficial wounds on defendant's right hand were similar to the superficial wounds on the victim with the exception that the victim's wounds were deeper than those of the defendant. The doctor testified that defendant's cuts could have been caused by more than one instrument, but it was her "general impression" that his wounds were similar to Krystal's.

Dr. Tsai found a small patch of white-yellowish crusted material on the victim's pubic hair. Two samples were taken from this area: (1) a swabbing of the pubic hair, and (2) a combing of the pubic hair with the crusted material attached.

Richard Caudell and Charles Robert Collier, crime scene technicians with the Illinois State Police, testified that none of the blood, hair, or fiber evidence collected from the scene could be positively identified as coming from the defendant, nor could fingerprints found at the scene be identified as defendant's.

Debbie Baldock testified that she lived approximately one-half mile from the Naabs. On July 23, she drove by the Naabs' residence about 10:15 or 10:30 a.m. She had just passed the Naab residence when a small white pickup truck crested the hill, going in the opposite direction. Baldock identified defendant as the driver.

Numerous witnesses testified that they saw a small white Dodge Dakota pickup truck at the Naabs' residence on July 23, 1991. The times they placed the truck there ranged from 12:15 p.m. to 3:15 p.m. All testified that they saw no tool boxes, but one witness stated that the truck he saw had unusual hubcaps. Another witness specifically identified defendant's truck as the one he had seen at the Naab residence, except that the tool boxes were missing, and the witness stated that he had seen defendant driving the truck before.

Jack Cook testified that when he drove by the Naabs' trailer at approximately 3 or 3:15 p.m., he saw a white Dodge Dakota pickup

truck begin backing out of the driveway. Cook described the driver as a man weighing 150 pounds, with dark hair and a thin moustache, but he did not identify defendant as the driver. A photograph of the defendant taken on the evening of the murder shows him with blondish-brown hair and a moustache. When shown the photograph of defendant's truck, Cook stated that the tool boxes were not in it on that day and he did not remember the running boards depicted on defendant's truck.

Louis Franklin testified that on the day of the murder he was mowing on his son's property about $1^1/4$ miles south of the Naabs. He was a couple of hundred feet from the road when, about 3:15 p.m., he saw a white pickup truck driving by at a very high rate of speed. Franklin testified that the photograph of defendant's truck looked like the truck he had seen that afternoon except that he did not remember any tool boxes in it.

Scott Washburn, defendant's neighbor, testified that at approximately 5:30 to 6 p.m. on the evening of July 23, he helped defendant lift two large white tool boxes into the back of defendant's pickup truck and fasten them down. Washburn also testified that he may have helped defendant install a third, black tool box but he could not remember.

Karen Heaton, defendant's wife, testified that on the morning of the murder, at approximately 7:45 a.m., defendant drove her to her job at the local hardware store. She stated that he was probably wearing sweat pants because that is what he was wearing when he visited her at work at approximately 4 or 4:30 p.m. on July 23. She denied previously telling a co-worker, Trudy Hitzer, that she was surprised that defendant visited her at work at that time as he would usually wait until she got off work and pick her up between 6 and 6:30 p.m. Hitzer, however, testified that when she saw Karen immediately after the 4:30 p.m. break, Karen told her that defendant had stopped by just to see her, which was unusual, and that he was acting strange. Further, Illinois State Police Agents Fred Bray and Kelly Henby testified that when they interviewed Karen Heaton on the evening of the murder she told them that when defendant took her to work that morning he was wearing jeans, a T-shirt, and tennis shoes. When he picked her up from work, defendant was wearing sweat pants and a long-sleeved shirt.

Dovie and Francis Bergin, defendant's mother and stepfather, testified that they lived approximately six miles from the Naab trailer. They stated that on July 23, 1991, defendant visited them at their home at approximately 3:25 p.m. He was wearing dark blue sweat pants and no shirt.

Dr. Robert Allen was qualified as an expert in DNA profiling. Dr. Allen testified that he received the two forensic samples taken from the crime scene: (1) the swabbing of the victim's pubic area, and (2) the semen combed from the victim's pubic hair. The swabbing also contained semen. Dr. Allen compared the DNA from the forensic samples with the DNA found in blood samples taken from defendant, Curtis Naab, and Brad Riley, the victim's boyfriend. Dr. Allen opined that defendant was the donor of the semen found on the victim. Dr. Allen determined the frequency of a random match, that is, the likelihood that another Caucasian male left the semen found on the victim, to be 1 in 52,600.

Dr. Gary Litman testified as defendant's expert witness. He testified that the internal procedures used in Dr. Allen's laboratory might be too subjective and, because an insufficient amount of DNA was extracted from the forensic samples, the DNA tests were inconclusive.

Ralph Bruno, an employee at Landreth Lumber Company, testified that sometime between 11:30 a.m. and 12:30 p.m., defendant came into the store to pick up an estimate of materials, but Bruno was not sure that this occurred on July 23, 1991.

Joan Carter testified that on July 23 at approximately 12:40 p.m., she saw defendant pulling out of the parking lot at the lumber company. He was driving his white Dodge pickup truck.

## I

Defendant's first argument on appeal goes to the admission of DNA identification evidence against him at his trial. Essentially, DNA profiling is a two-step process: (1) "matching" the defendant's DNA with the evidence found at the crime scene, and (2) the estimation of the probability that someone other than defendant committed the crime.

A six-step procedure known as "Restriction Fragment Length Polymorphism" (RFLP) performs the "matching" function while the "product rule" is used to calculate the frequency of a random match. The suspect's DNA profile can be compared to evidence recovered from a crime scene, such as blood, semen, or saliva, to determine whether, in fact, there is a "match" between the subject's DNA and the DNA recovered at the crime scene.

The determination of a match does not mean that the suspect has been positively identified, however. There are approximately 3 million distinguishable polymorphisms between individuals, and the examination of all of them is not currently feasible. Thus, there is still the possibility that someone possessing the same DNA profile as

the suspect donated the evidence found at the crime scene. Accordingly, the probability of a random match must be statistically calculated. The method used to calculate this statistic is known as the "product rule."

In the instant case, Dr. Allen testified that he used the product rule in calculating the likelihood of a random match at 1 in 52,600. Over defendant's objections, Dr. Allen opined that defendant was the donor of the semen found on the victim. He further concluded that the probability of another Caucasian male leaving the semen found on the victim was 1 in 52,600.

Defendant argues on appeal that the trial court erred in admitting the DNA identification evidence because the product-rule method used by Dr. Allen did not meet the foundational requirement of *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, which has been adopted in Illinois. (See *People v. Eyler* (1989), 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285.) The parties agree that Illinois adheres to the *Frye* rule, and the parties do not dispute that the theory underlying DNA analysis and the RFLP matching method meet the *Frye* test of general acceptance in the scientific community. At issue is whether the method used to calculate the probability of a random match, that is, the product-rule method, also meets the *Frye* standard. Defendant contends that use of the product rule is not generally accepted in the scientific community and, therefore, the DNA evidence was inadmissible under *Frye*.

In support of his argument, defendant relies entirely on the recently published report entitled "DNA Technology in Forensic Science" published by the National Research Council (NRC Report). This report was published two months prior to defendant's trial, and defendant was aware of the report at the time of trial, for he referred to it briefly while cross-examining Dr. Allen. However, the report was never submitted to or brought to the attention of the trial court at any time, in any form. The report is before this court only as an appendix to defendant's brief, for it is not contained in the record on appeal. Defendant argues on appeal that the report demonstrates that there is considerable debate in the scientific community over the use of the product-rule method, that the product-rule method is therefore not generally accepted in the scientific community, and that the DNA identification evidence in the case at bar should be deemed unreliable and inadmissible under *Frye*.

Prior to the publication of the NRC Report, Illinois courts had held that the six-step RFLP procedure, including the product-rule method of statistical analysis, was admissible under *Frye*. (*People v. Stremmel* (1994), 258 Ill. App. 3d 93, 630 N.E.2d 1301; *People v. Mehl-*

*berg* (1993), 249 Ill. App. 3d 499, 538, 618 N.E.2d 1168, 1194; *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 432, 574 N.E.2d 1345, 1357; *People v. Miles* (1991), 217 Ill. App. 3d 393, 404-05, 577 N.E.2d 477, 485.) Defendant made a pretrial motion in the trial court asking for a *Frye* hearing on the DNA identification evidence just two weeks prior to the publication of the NRC Report. The State moved to strike defendant's request for a *Frye* hearing and moved the court to take judicial notice of *Lipscomb* and *Miles*, which held that DNA identification evidence, including use of the product-rule method of statistical analysis, was admissible. Relying on the precedential authority of *Lipscomb* and *Miles*, and with no contrary evidence or authority submitted by defendant, the trial court denied defendant's motion for a *Frye* hearing and ruled that the DNA identification evidence would be admissible at defendant's trial. Upon learning of the NRC Report, defendant did not renew his motion for a *Frye* hearing, nor did he make a motion *in limine* to exclude the DNA identification evidence, although he had ample time to do so.

▮ We now turn to the question of the proper standard of review. Our supreme court has plainly spoken on this issue in *People v. Eyler* (1989), 133 Ill. 2d 173, 211-12, 549 N.E.2d 268, 285. The determination whether to admit expert testimony concerning a new scientific technique such as DNA profiling is committed to the discretion of the trial court. Accordingly, we review the trial court's decision to admit expert testimony concerning DNA analysis to determine whether the trial court abused its discretion.

▮ A reviewing court must determine the issues before it on appeal solely on the basis of the record made in the trial court. (*People v. Mehlberg* (1993), 249 Ill. App. 3d 499, 532, 618 N.E.2d 1168, 1190.) It is apparent that this is particularly true when reviewing a trial court's determination under the abuse-of-discretion standard. Thus, evidence which is not part of the record on appeal is not to be considered by a reviewing court (*People v. Bosley* (1990), 197 Ill. App. 3d 215, 223, 553 N.E.2d 1187, 1193), and attachments to briefs on appeal, not otherwise before the reviewing court, cannot be used to supplement the record. (*People v. Blanchette* (1989), 182 Ill. App. 3d 396, 397-98, 538 N.E.2d 237, 238.) Facts not properly of record cannot be considered by this court on review. *People v. Burt* (1986), 142 Ill. App. 3d 833, 837, 492 N.E.2d 233, 237.

▮ Further, this court will not take judicial notice of critical evidentiary material not presented in the court below, and this is especially true of evidence which may be significant in the proper determination of the issues between the parties. (*Mehlberg*, 249 Ill. App. 3d at 531, 618 N.E.2d at 1190.) It is obvious from defendant's

argument on appeal that the NRC Report is the type of critical evidentiary material which may be significant in the determination of the issue between the parties. This court was confronted with a similar situation in *Mehlberg*, where defendant relied on magazine and law review articles on the subject of DNA evidence which were presented for the first time in the appendix to defendant's brief on appeal. We stated:

"[These] articles *** are not mere informational articles intended to assist this court in reviewing issues related to a complicated scientific field but are instead an attempt to interject expert-opinion evidence into the record ***. As such, this written authority offered by defendant was never subject to cross-examination by the State and constitutes evidence which was never considered by the trial court. We also note an absence of these articles as references in support of defendant's pretrial motion to exclude DNA testing results *** or in response to the State's pretrial request to admit evidence of DNA fingerprinting identification analysis." (*Mehlberg*, 249 Ill. App. 3d at 531-32, 618 N.E.2d at 1190.)

We reach the same conclusion as the *Mehlberg* court, and we will not consider the NRC Report. Judicial notice cannot be extended to permit the introduction of new factual evidence not presented to the trial court. *Ashland Savings & Loan Association v. Aetna Insurance Co.* (1974), 18 Ill. App. 3d 70, 78, 309 N.E.2d 293, 299.

Finally, the NRC Report does not qualify as citation of relevant authority in support of the defendant's argument on appeal. See *People v. Bosley* (1990), 197 Ill. App. 3d 215, 223, 553 N.E.2d 1187, 1193.

The purpose of appellate review is to evaluate the record presented in the trial court, and review must be confined to what appears in the record. (*People v. Majer* (1985), 131 Ill. App. 3d 80, 83, 475 N.E.2d 269, 271.) The proper place to present and analyze data such as the NRC Report is in the trial court (see *People v. Lutz* (1982), 103 Ill. App. 3d 976, 980, 431 N.E.2d 753, 756), and this court should consider only that which appears in the record on appeal. See *People v. Gacho* (1988), 122 Ill. 2d 221, 254, 522 N.E.2d 1146, 1162.

■ The trial court's decision in the instant case was rendered without the benefit of the NRC Report because the defendant never presented this report to the trial court or brought it to the trial court's attention in any way. Defendant could have filed a pretrial motion *in limine* on which he could have presented evidence, including the NRC Report. Defendant did not do so. Thus, what the trial court had before it in rendering its decision were the reported cases, *Lipscomb* and *Miles*, brought to the court's attention by the

State, which hold that DNA testing and the product-rule method are admissible under the *Frye* test. Under these circumstances it cannot be said that the trial court's decision to admit the DNA evidence was an abuse of its discretion.

In his reply brief, the defendant states:

"The trial court need not and should not have followed *Lipscomb* and *Miles* in the face of evidence that Dr. Allen's product method for interpreting a DNA match was a subject of debate within the scientific community, and it was error for the trial court to have overruled Stuart Heaton's objection to the admission of this critical evidence."

Clearly, however, the trial court was not faced with evidence that Dr. Allen's product-rule method was the subject of debate within the scientific community. Defendant presented no such evidence, and no such evidence is properly before this court on review. Accordingly, we find that the trial court did not abuse its discretion in following the authority of *Lipscomb* and *Miles* and admitting the DNA identification evidence.

We are certainly aware of *People v. Watson* (1994), 257 Ill. App. 3d 915, 924, 629 N.E.2d 634, 640, in which the court exercises what it describes as a "broad review of the trial court's determination with respect to the general acceptance of forensic DNA analysis" to justify its consideration of the NRC Report which, in *Watson* as in the instant case, was not before the trial court when the trial court made its determination as to the admissibility of DNA identification evidence. *Watson* seems to hold that a *de novo* review of the trial court's determination is appropriate where the question of the general acceptance of a new scientific technique is raised. We cannot agree with this conclusion. To the extent *Watson* deviates from the abuse-of-discretion standard of review so clearly mandated by our supreme court in *Eyler*, we reject *Watson*. We are bound to follow the supreme court's pronouncement in *Eyler* that we are to review the decision of the trial court to determine whether it abused its discretion in admitting into evidence the DNA identification evidence. Under this standard of review, we must look at the state of the record as it existed in the trial court at the time the trial court made its determination. This court may not consider on review evidence which was not before the trial court and is not contained in the record on appeal.

For the foregoing reasons, the judgment of the circuit court of Fayette County is affirmed.

Affirmed.

LEWIS, P.J., concurs.

JUSTICE RARICK, dissenting:

I respectfully dissent. I would hold that the trial court abused its discretion in overruling defendant's objection at trial to the admission of the DNA evidence. I find *Watson* persuasive, and I believe the NRC Report to be properly before us. The questions raised by Dr. Allen's testimony regarding the acceptance by the scientific community of the product-rule method of determining the probability of a random match are serious enough, in my judgment, that the trial court should have excluded the DNA evidence. Assuming, *arguendo*, that defendant waived any challenge to the admission of the DNA evidence, I would find this issue reviewable under the plain-error doctrine. A defendant has the right to be tried on the basis of competent and reliable evidence. *Watson* and the authorities cited herein strongly suggest that the product rule does not meet the general-acceptance test under *Frye*, and therefore, the method cannot be deemed reliable. Finally, I would consider the case on the basis of ineffective assistance of counsel. Defense counsel was aware of the NRC Report, and its importance was readily apparent.

Defendant's pretrial motion for a *Frye* hearing alleged that forensic DNA typing was unreliable and not generally accepted in the scientific community. It did not specifically argue that the product rule was the subject of a controversy in the scientific community. Given this, along with the prior cases holding DNA evidence admissible, I agree that the trial court correctly denied defendant's pretrial motion for a *Frye* hearing.

At trial, however, when defendant renewed his pretrial objections to the admissibility of the evidence, he did so after cross-examining Dr. Allen with respect to the product rule. Although the NRC Report had not yet been issued when the hearing on defendant's pretrial motion for a *Frye* hearing was held, it had been issued by the time of trial and it was discussed during Dr. Allen's cross-examination. His testimony revealed that the thrust of the report was that the possible presence of subpopulations could result in inaccurate estimates of the probability of random matches. He acknowledged that many population geneticists were still raising questions regarding the product-rule method of calculating the probability of a random match. Given the persuasive power of DNA evidence and the particular importance of such evidence in this case, I believe the trial court abused its discretion in overruling defendant's objection to the DNA evidence.

With respect to the majority's position that the NRC Report is not part of the record before us, I agree that *Eyler* stands for the proposition that the admission of expert testimony on the issue of

whether a new scientific technique or procedure is generally accepted in the scientific community is a matter for the discretion of the trial court. The court in *Watson* likewise recognized this principle but also recognized that, because the formulation of law is an appellate function, a broad review of the trial court's decision, encompassing not only the evidence before the trial court but also judicial opinions from other jurisdictions as well as pertinent legal and scientific commentaries, was warranted. (*People v. Watson* (1994), 257 Ill. App. 3d 915, 924, 629 N.E.2d 634, 640.) I would follow *Watson* in the present case.

While Illinois courts have held that the six-step RFLP procedure is admissible under *Frye*, these decisions were rendered without the benefit of the NRC Report. Defendant notes that the NRC Report treats the estimation of a random match as an integral part of the DNA analysis:

> "Interpreting a DNA typing analysis requires a valid scientific method for estimating the probability that a random person by chance matches the forensic sample at the sites of DNA variation examined. To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless." (NRC Report, at 74.)

Significantly, I note that a recent Illinois case has relied on this language to hold that a reliable probability estimate is essential in order to give meaning to a "match" and, absent such an assessment, evidence of a "match" standing alone is inadmissible at trial. (*People v. Watson* (1994), 257 Ill. App. 3d 915, 929-30, 629 N.E.2d 634, 644.) Furthermore, as *Miles* recognized, *Lipscomb* implicitly held that the process of generating probability statistics is an integral part of the DNA identification process, which must meet the general acceptance test under *Frye*. See *Miles*, 217 Ill. App. 3d at 404-05, 577 N.E.2d at 485.

Because DNA test results are contingent upon a valid estimate of a random match, the method used to generate that estimate must meet the test of general acceptance in the scientific community. The statistical method used should be treated as a novel scientific principle subject to the *Frye* test, and absent such consensus, the DNA evidence should be inadmissible.

The NRC Report indicates that the multiplication or product rule is widely used in DNA analysis to determine the probability of a random match. The product rule is based on two assumptions: (1) the alleles at a given locus are inherited independently or are in "linkage equilibrium," and (2) the population is in "Hardy-Weinberg equilibri-

um," that is, it mates randomly and therefore the gene pool is evenly distributed. If significant substructuring exists, then the underlying assumptions of the product rule fail. Therefore, the validity of the product rule depends on the absence of population substructure. The NRC Report indicates that the possibility of substructuring has provoked "considerable debate" among population geneticists: some believe the substructuring is significant, while others believe the degree of substructure will not significantly affect the probability estimate. The NRC Report characterizes this dispute as a "substantial controversy" concerning the methods for estimating the population frequencies of specific DNA typing patterns.

Because the probability estimate is an integral part of the DNA analysis, without it, evidence of a "match" is meaningless. The publication of the NRC Report has had a profound effect on this area of the law. As one court noted: "Since the issuance of the DNA Committee Report [NRC Report], an overwhelming majority of courts have excluded the evidence of a match after finding the corresponding statistical calculation to be inadmissible because not scientifically reliable." (Emphasis omitted.) (*Nelson v. State* (Del. 1993), 628 A.2d 69, 76; *State v. Anderson* (N.M. Ct. App. 1993), 115 N.M. 433, 853 P.2d 135; *State v. Cauthron* (1993), 120 Wash. 2d 879, 846 P.2d 502; *People v. Barney* (1992), 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731; *Commonwealth v. Lanigan* (1992), 413 Mass. 154, 596 N.E.2d 311; *State v. Vandebogart* (1992), 136 N.H. 365, 616 A.2d 483.) I agree with this line of authority and would find that there is a significant controversy in the scientific community over use of the product method and, therefore, the DNA evidence herein was inadmissible under *Frye*.

I note that the NRC Report recommends the use of an alternative method of calculating the probability of a random match referred to as the modified-ceiling principle. I would remand with directions that the circuit court hold a *Frye* hearing to determine whether this method is generally accepted in the relevant scientific field. If the court determines that this principle meets the *Frye* test, it must then determine the appropriate probability estimate to be admitted at a new trial. (See *Watson*, 257 Ill. App. 3d at 935-36, 629 N.E.2d at 648; *State v. Bloom* (Minn. April 29, 1994), 55 Crim. L. Rep. (BNA) 1168.) If the court determines that the modified-ceiling principle does not meet the *Frye* test, the DNA evidence must be excluded.