2021 IL App (1st) 182595-U

No. 1-18-2595

Order filed March 31, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 C5 50594 |
| | ) | |
| DAMIEN HARRIS, | ) | Honorable |
| | ) | Colleen A. Hyland, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for theft of property valued between $100,000 and $500,000 is affirmed over his claims that the court admitted improper hearsay evidence and that the evidence was insufficient to convict him of the crime.

¶ 2    Following a bench trial, defendant Damien Harris was found guilty of two counts of theft of property valued between $100,000 and $500,000 (720 ILCS 5/16-1(a)(1), (b)(6) (West 2014)). The court merged the counts and sentenced defendant to eight years' imprisonment. He appeals,

arguing that the trial court erred by admitting hearsay testimony regarding the value of the property, and that the evidence was insufficient to establish the value of the property. We affirm.

¶ 3     Defendant was charged by information with two counts of theft of property valued between $100,000 and $500,000, specifically flatbed trailers containing four crane parts called counterweights, following an incident on July 19, 2015. Count I alleged that defendant intended to permanently deprive the owner of the use or benefit of the property, while count II alleged that defendant knowingly used, concealed, or abandoned the property so as to permanently deprive the owner of its use or benefit.

¶ 4     At trial, Judith Mooncotch testified that in July 2015, she was the president of LaGrange Crane Service (LaGrange), a crane rental company, where she had worked since 1999. On July 19, 2015, LaGrange's lot contained functioning video surveillance equipment. Mooncotch identified People's Exhibit No. 1 as a DVD containing accurate footage from that date, which the State offered into evidence and then published. During the playback, Mooncotch testified that it depicted someone removing a flatbed trailer containing two counterweights from the yard around 8:12 a.m., with two more counterweights taken in the same manner around 11:25 a.m. Mooncotch testified that counterweights are made from steel, forged for a specific crane, and are not interchangeable. She did not know defendant and did not give him permission to enter the LaGrange lot.

¶ 5     The video, which is included in the record on appeal and is timestamped, depicts a red tractor trailer cab enter the lot at approximately 8:04 a.m. At around 8:12 a.m., the cab was shown connected to a trailer bed containing two counterweights exiting the lot. At approximately 11:25 a.m., the cab returns and again drives away with another trailer bed containing two additional counterweights.

¶ 6    The State introduced People's Exhibit No. 13, which Mooncotch identified as a quote to replace the counterweights from a company known as Walter Payton Power Equipment (WPPE). Mooncotch testified that LaGrange purchased the cranes to which the counterweights belonged from WPPE, and that one crane costs $4.5 million. She believed the counterweights were worth "[j]ust under $200,000" based on a "piece of paper" that she received as a quote because she "asked an authorized dealer what it would cost to replace them." She further explained that "[a]ll my knowledge" about the cost of the counterweights reflected information from "the dealer or the crane manufacturer." The court overruled defense counsel's hearsay objection to Mooncotch's testimony about the counterweights' value because all of the testimony concerned replacement value only. We find that the trial court erred in overruling this objection and in allowing the exhibit into evidence at that point in time, but that error was harmless because later evidence properly depicted the value of the property taken.

¶ 7    Matthew Musick, a crane operator at LaGrange, testified that on July 19, 2015, he arrived at work and noticed that the chain on the front gate was cut. The State again played portions of People's Exhibit No. 1, and Musick testified that the footage at 7:44 a.m. showed an individual he did not recognize cut the chain with bolt cutters. The video was consistent with Musick's testimony.

¶ 8    Sergeant Jeff Keilman of the Hodgkins Police Department testified that on July 19, 2015, he went to LaGrange to investigate the theft. He spoke to Mooncotch and Musick, recovered fingerprints, photographed the scene, and viewed the surveillance video, then disseminated a flier to local law enforcement containing still images from the video of the individual who cut the gate.

On July 20, 2015, a police officer from the Chicago Police Department contacted Keilman and directed him to South Shore Recycling (South Shore) in Chicago.

¶ 9    At South Shore, Keilman met Sergeant Scaberti[1] of the Chicago Police Department and Jeff Handelman, the owner of South Shore. Scaberti and Handleman were with another man, whom Keilman identified in court as defendant. Keilman also observed one of the trailer beds with two counterweights on it. Keilman arrested defendant, placed him inside the police vehicle, and Mirandized him. Defendant then told him that he was selling the counterweights and had more at a location on the 8200 block of South Chicago Avenue in Chicago. Keilman went to the location and recovered the other trailer bed and two counterweights. On cross-examination, Keilman testified that defendant's statements in the vehicle were not recorded or memorialized.

¶ 10    Handelman testified that on July 20, 2015, defendant arrived at South Shore with counterweights that Handelman agreed were "newer looking," which concerned him because "scrap is usually a little bit more worn." As a result, he called the police.

¶ 11    David Wisnieski, director of parts and operations for WPPE, testified that WPPE's business was to "sell cranes, equipment, and parts for various manufacturers." WPPE provided Mooncotch with a quote to replace the counterweights. WPPE maintains records of any quotes it provides in the normal course of its business. The quoted price was for the "replacement component" itself, and did not include labor. Wisnieski testified that one of his employees received the prices for the counterweights from the manufacturer, and then included the prices in the quote given to Mooncotch.

---

[1] Scaberti's first name does not appear in the report of proceedings.

¶ 12    The State showed People's Exhibit No. 13, which contained the quote, to Wisnieski, and then asked for the cost of the replacement value of the counterweights, to which defense counsel objected. The trial court sustained the objection, and the court stated that the State could "lay a foundation as to [Wisnieski's] knowledge of the value of the counterweights." Wisnieski then testified that the quote reflected the fair market value of the counterweights, which would be the manufacturer's suggested sell price at the time. He further explained that counterweights do not lose value, were an "extremely valuable part of the crane," and that the crane could not function without them. Wisnieski testified that the cost to replace the particular counterweights was $194,000, including tax. One was for $72,572.68, and the other was for $105,952.40. After viewing People's Exhibit No. 13, Wisnieski testified that the total value of the counterweights, including tax, was $194,000. Counterweights were typically not purchased separately from the crane. He believed there "would not be any wear and tear" on the counterweights over the course of normal operations.

¶ 13    On cross-examination, Wisnieski testified that no one from WPPE inspected the counterweights in July 2015. WPPE sometimes sells used components, including counterweights, though counterweights are often not available unless a crane is salvaged or totaled. He agreed that an employee of WPPE generated the document containing the replacement quote, but the counterweight prices therein reflected the manufacturer's replacement cost.

¶ 14    At the conclusion of Wisnieski's testimony, defense counsel objected to the admission of the replacement quote on the grounds that the State did not lay the foundation to qualify it as a business record because it was not "made near the time by a person with knowledge." The court overruled the objection and stated that replacement costs is not the issue in this case.

¶ 15    The State rested, and defense counsel moved for a directed finding, arguing that the State had not established the fair cash market value for the counterweights at the time of the taking. In response, the State referenced the replacement quote and Wisnieski's testimony that the counterweights do not depreciate in value. The court denied the motion, the defense rested, and the parties adopted their arguments from the motion for a directed finding as their closing arguments.

¶ 16    The court found defendant guilty of counts I and II for theft of property valued between $100,000 and $500,000. In so finding, the court explained that, "The main question *** is has the State proven that those counterweights were over the value of $100,000." The court ruled that the State proved this element, citing Mooncotch's testimony that the counterweights were valued just under $200,000, which she based on WPPE's quote to replace them, and Wisnieski's testimony that WPPE quoted LaGrange "the manufacturer's suggested sale price" of $194,000. The court also referenced *People v. Heinz*, 87 Ill. App. 3d 1 (1980), for the proposition that an item's "fair cash market value" may reflect "the price placed by *** retail merchants."

¶ 17    At a proceeding on June 13, 2018, the court permitted defendant to proceed *pro se*. Defendant then filed a *pro se* motion for a new trial, which he later amended. On November 30, 2018, the court conducted a preliminary inquiry on defendant's posttrial ineffective assistance of counsel claim under *People v. Krankel*, 102 Ill. 2d 181 (1984), and then denied defendant's amended motion for a new trial. The *Krankel* issue is not a part of this appeal. At a later proceeding, the court merged count II into count I for theft of property valued between $100,000 and $500,000 and sentenced defendant to eight years' imprisonment on count I. Defendant did not file a motion to reconsider sentence.

¶ 18    On appeal, defendant first argues that his conviction should be reversed because the only evidence at trial establishing the value of the counterweights was inadmissible hearsay.[2]

¶ 19    Hearsay is an out-of-court statement offered for the truth of the matter asserted, and is generally inadmissible unless an exception applies. *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided" in the Illinois Rules of Evidence. Ill. R. Evid. 805 (eff. Jan. 1, 2011).

¶ 20    Hearsay evidence is admissible under the exception for records of regularly conducted activity, or business records, where the record was created at or near the time of the activity by "a person with knowledge," "kept in the course of a regularly conducted business activity," and if it was the "regular practice of that business activity" to make the record. Ill. R. Evid. 803(6) (eff. Sept. 28, 2018). Where a business receives information from a third party, that information can be admitted as part of the business's own records under Rule 803(6) on a showing that the business received the information in its normal course of business, integrated the information, and used it in its day-to-day activities. See *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 86; see also *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11, 21 (1991) ("Where a third party is authorized by a business to generate the record at issue, the record is of no use to the business unless it is accurate and, therefore, the record bears sufficient indicia of reliability to

_____

[2] Although trial counsel made a contemporaneous hearsay objection in response to the testimony regarding the value of the counterweights, defendant's *pro se* posttrial motion and amended motion generally alleged the State did not establish the value of the counterweights without reference to the hearsay issue. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required"). The State does not argue, however, that defendant forfeited this claim, and has therefore forfeited any forfeiture argument. See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000).

qualify as a business record under the hearsay rule."). We review the evidentiary decisions of the lower court for abuse of discretion. *People v. Chambers*, 2016 IL 117911, ¶ 75. An abuse of discretion occurs when a trial court's decision is arbitrary, fanciful, unreasonable, or where no reasonable person would adopt the court's view. *Horlacher v. Cohen*, 2017 IL App (1st) 162712, ¶ 81.

¶ 21    In the case at bar, the trial court properly admitted the quote for the replacement cost for the counterweights on Wisnieski's testimony that WPPE generated the quote and that the quote came from the manufacturer as its price for new counterweights. There was testimony to support the fact that the quote is the type of record kept in the ordinary course of business and that it was the business of WPPE to obtain such quotes in its regular practice. As a result, this qualifies as a business record exception to the hearsay rule. Ill. R. Evid. 803(6) (eff. Sept. 28, 2018).

¶ 22    Defendant's next argument is that the evidence is insufficient to establish the value of the counterweights even if the manufacturer's replacement costs were admissible because there was no evidence establishing the counterweight's fair cash market value. Although normally replacement cost is not the fair cash market value of a product, in this case, there is a narrow exception to that rule. Replacement cost is normally much higher than the fair cash market value. *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 32. In the case at bar, the unrefuted testimony of Wisniecki showed that counterweights do not depreciate in value and that their condition does not diminish their value over time. In addition, there was testimony that illustrated that these counterweights appeared and looked like they were new. Thus, the price for new counterweights would not be any different than the price for the counterweights that were taken

here. Therefore, under the narrow exception to the general rule, the replacement costs here would be the fair cash market value of the counterweights.

¶ 23    Defendant argues pursuant to *People v. McCullough*, 2015 IL App (2d) 121364, that because the third-party manufacturer provided the prices to WPPE, the prices constitute double hearsay and were inadmissible without their own exception.

¶ 24    In *McCullough*, the defendant sought to show that a particular individual made a collect call through telephone record evidence, generated by an operator, who included the name the individual making the collect call provided her. The reviewing court decided that the trial court did not err in excluding the evidence, as the name the operator recorded was provided by the third-party caller, an "outsider not acting in the regular course of the telephone company's business." *McCullough*, 2015 IL App (2d) 121364, ¶ 122. As the *McCullough* court further explained, double hearsay "is excused by Rule 803(6) only where both the source and the recorder of the information *** are acting in the regular course of business. [Citation.]." *McCullough*, 2015 IL App (2d) 121364, ¶ 121. Where the "source of the information is an outsider," the "statement must fall within another hearsay exception to be admissible." *McCullough*, 2015 IL App (2d) 121364, ¶ 121 (citing *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991) ("the outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the course of regular business have")).

¶ 25    *McCullough* did not address the exception for third-party information received by a business that then integrates the information and uses in its daily operation. Moreover, the case at bar is more analogous to *Solis* and *Argueta* than *McCullough.* In *Solis*, the trial court admitted letters from third-party doctors sent to a patient's treating doctor. *Solis*, 2012 IL App (1st) 110875,

¶ 86. The treating doctor testified at trial, and provided a foundation for the letters. *Solis*, 2012 IL App (1st) 110875, ¶ 86. This court reasoned that though the third-party doctors had not treated the patient in the course of the treating doctor's practice, the treating doctor had incorporated those letters into his course of treatment, and thus could establish the foundation for the letters. *Solis*, 2012 IL App (1st) 110875, ¶ 86. Similarly, in *Argueta*, this court ruled that the trial court erred by excluding third-party reports commissioned by the defendant railroad, where the railroad established that it relied on the accuracy of the reports, and requested and maintained the reports in the regular course of its business. *Argueta*, 224 Ill. App. 3d at 20-21.

¶ 26  Likewise, here, a reasonable interpretation of the evidence is that the manufacturer provided the price information to WPPE pursuant to a business relationship, and WPPE in turn integrated that information and used it in the course of its own business. Thus, this situation is distinct from *McCullough*, where the third party had no business relationship with the primary entity. Accordingly, we cannot say the trial court abused its discretion by admitting the entire quote document, including the price information.

¶ 27  Defendant next argues that the evidence was insufficient to establish the value of the counterweights, even if the manufacturer's price was admissible, because no evidence established the counterweights' fair cash market value.

¶ 28  When considering the sufficiency of the evidence, the reviewing court construes the evidence in the light most favorable to the State and determines whether any rational factfinder could find the defendant guilty beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. All inferences are drawn in favor of the State. *People v. Eubanks*, 2019 IL 123525, ¶ 95. The reviewing court must not substitute its judgment for that of the factfinder regarding the weight of

the evidence and the credibility of witnesses. *People v. Hardman*, 2017 IL 121453, ¶ 37. The defendant's conviction should be affirmed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it raises reasonable doubt of his guilt. *Newton*, 2018 IL 122958, ¶ 24.

¶ 29    To establish the value element of theft crimes, the State must enter evidence to establish the "fair cash market value" of the property at the time of the theft. *People v. Perry*, 224 Ill. 2d 312, 336 (2007). The State need not prove the property's exact value. *People v. Davis*, 132 Ill. App. 3d 199, 203 (1985). The property's replacement cost or purchase price is not normally equivalent to fair cash market value. *People v. Brown*, 36 Ill. App. 3d 416, 421 (1976) (citing *People v. Stewart*, 20 Ill. 2d 387 (1960)). Evidence of the property's cost, however, along with evidence regarding its "condition, quality, and modernness or obsolescence," can provide a basis to establish the fair cash market value. *Brown*, 36 Ill. App. 3d at 421 (citing *People v. Todaro*, 14 Ill. 2d 594 (1958)). Additionally, testimony can be sufficient to establish a felony threshold amount even if it was not specifically addressed to the property's fair cash market value. *People v. Cobetto*, 66 Ill. 2d 488, 491 (1977).

¶ 30    Here, the quote to replace stated that the replacement cost of the counterweights was $194,000, including tax. Wisnieski testified that counterweights typically do not suffer from wear and tear and do not depreciate in value, though neither he nor anyone from WPPE had examined the specific counterweights at issue. He further testified that counterweights can be purchased used, but it is not a common practice, and they are generally not interchangeable. Jeff Handelman of South Shore testified that the counterweights appeared new to a degree that he believed he should alert the police.

¶ 31    We find that a rational factfinder could have concluded that the record established the counterweights had a fair cash market value between $100,000 and $500,000 at the time of the theft. While the replacement cost of $194,000 is not conclusive, it can be considered alongside other evidence to establish value. *Brown*, 36 Ill. App. 3d at 421. Here, the evidence suggested that the counterweights were in such good condition when they arrived at South Shore that Handelman believed they looked new, and he should therefore call the police because they were likely stolen. Additionally, Wisnieski testified that counterweights do not lose their value over time and were unlikely to sustain wear and tear. While this is not conclusive of the actual condition of the counterweights, as Wisnieski admitted he did not personally view them, a rational factfinder could consider this testimony along with Handelman's testimony to conclude that the counterweights were in good condition and were not obsolete. Additionally, Wisnieski testified that counterweights can be sold used, though it is rare, which permits the inference that the counterweights had a market value apart from their utilization in the particular cranes LaGrange purchased from WPPE.

¶ 32    This record supports the conclusions that the counterweights at issue had an initial value of approximately $94,000 over the statutory limit, were in good condition and not obsolete at the time of the theft, and had value in a secondary market apart from their utilization in their original cranes. A rational factfinder could conclude from these facts that the counterweights' fair cash market value was between $100,000 and $500,000 at the time of the theft.

¶ 33    Defendant argues that the evidence only established replacement cost and did not demonstrate the counterweights' actual condition at the time of the theft. Defendant further argues that logic and the fact of a secondary market for used counterweights requires this court to assume

that counterweights depreciate in value, counter to Wisnieski's testimony. But even conceding these points, we must draw all reasonable inferences in favor of the State and view the evidence in the light most favorable to the State. *Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, the record supports a conclusion that though the counterweights possibly depreciated in value to some degree, their fair cash market value remained over $100,000 at the time of the theft.

¶ 34 Finally, we acknowledge that defendant cites materials in his brief that were not included in the record at trial, namely information from "crane resale websites" indicating that cranes reduce in value over time, and asks that we take judicial notice of certain facts contained in the materials. As the State argues, we may not consider these materials for the purposes of this appeal. See *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994) (the court on appeal should not take judicial notice of materials not before the trial court). Consequently, we will not disturb the trial court's conclusion that the counterweights had a fair cash market value between $100,000 and $500,000 at the time of the theft.

¶ 35 For the foregoing reasons, defendant's conviction is affirmed.

¶ 36 Affirmed.