2021 IL App (1st) 200089-U

No. 1-20-0089

Order filed November 24, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 21492 |
| | ) | |
| DANIEL AVITIA, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for aggravated battery with a firearm is affirmed over his claim that the victim's identification testimony was unreliable.

¶ 2    Following a bench trial, defendant Daniel Avitia was found guilty of aggravated battery with a firearm and aggravated discharge of a firearm. The court merged the offenses and sentenced defendant to 20 years' imprisonment for aggravated battery with a firearm. Defendant appeals, arguing the victim's identification testimony was unreliable. We affirm.

¶ 3      Defendant was charged by indictment with multiple offenses, including attempted murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a) (West 2012)), aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2012)), following the shooting of Henry Garcia[1] on July 22, 2013.

¶ 4      At trial, Chicago police detective Peter Maderer testified that on March 1, 2013, he learned defendant was identified as a witness to a recent shooting near 79th Street and Pulaski Avenue in Chicago. Maderer interviewed defendant, who relayed that while driving with his brother, Andres Avitia[2], members of the Latin Kings gang fatally shot Andres. Defendant knew the shooter as "Reaper"; this individual was later determined to be Edwin Garcia, the brother of Henry.

¶ 5      Jaclyn Lantz, a Cook County State's Attorney, testified that on March 1, 2013, defendant provided a handwritten statement regarding Andres's shooting. In the statement, which Lantz read into the record, defendant stated Edwin and others assaulted and robbed defendant's brother Ramon Avitia in early January 2013, after which Ramon called the police. Edwin then harassed the Avitia family until the date Andres was shot.

¶ 6      Chicago police detective Robert Graves testified that he investigated the March 1, 2013, shooting, and the State's Attorney did not approve charges against Edwin.

¶ 7      The State entered a stipulation that, if called, Dr. Adrienne Segovia, an assistant Cook County medical examiner, would testify that she performed Andres's autopsy on March 3, 2013, and concluded that he died by homicide due to multiple gunshot wounds.

---

[1] As Henry Garcia and two other witnesses, Edwin Garcia and Benita Garcia, have the same last name, we will refer to them by their first names.

[2] As defendant, Ramon Avitia, and Andres Avitia have the same last name, we will refer to Ramon and Andres by their first names.

¶ 8      Henry testified that he was convicted of aggravated driving under the influence in January 2018 and was currently on probation. In 2013, he and Edwin were members of the Latin Kings gang. Henry had known defendant's family for approximately two to three years. Defendant and his brother Ramon were members of the La Raza gang, and defendant's nickname was "Tomato."

¶ 9      On July 22, 2013, around 3:30 p.m., Henry was at his home in Posen, Illinois, near 143rd Street and Sherman Avenue, with his two younger brothers, mother, and sister. Henry looked through a window and observed a red SUV approach; he initially testified the window was in the kitchen, but then described it as the "front" window. Nothing obstructed his view. The vehicle slowed and stopped outside Henry's home. Defendant, the driver, whom Henry identified in court, proceeded to "[t]ake out a gun and start shooting." Henry ducked, then he heard "a lot" of gunshots, and felt pain in his back. He told his brothers to run, then crawled towards his mother Benita Garcia's room and told her "Tomato" shot him. Benita commenced calling 911. Henry, however, finished making the call as Benita had a panic attack. The police arrived five to seven minutes later.

¶ 10     Henry was hospitalized and received treatment for a gunshot wound. The bullet entered his back and exited through his thigh. The next day, in the hospital, he informed Chicago police officers that "Tomato" shot him while driving a red vehicle. Upon returning home, officers showed Henry photographs wherein he identified the red vehicle. At a later date, Henry identified defendant in a physical lineup at the police station.

¶ 11     On cross-examination, Henry denied that he still belonged to the Latin Kings. He further denied that, in March 2013, he told officers that Edwin shot Andres. He claimed officers "were making" him say that. Henry agreed that Ramon "put a case" on Edwin by lying about a robbery,

but denied that, immediately following the present incident, he initially told the police that the red vehicle belonged to Ramon.

¶ 12    Henry acknowledged that his written statement related that he looked out the front window, but stated at trial that this detail was incorrect, and in fact he looked out the kitchen window when he noticed the red vehicle. He said the police "wrote it down wrong," but agreed he had the chance to correct his statement and did not alter it. On redirect, Henry testified that he also told the grand jury that he saw a silver firearm in defendant's hand immediately before the shooting.

¶ 13    Benita testified that in July 2013, she lived with Henry in Posen. Defendant lived in the Chicago neighborhood where Benita formerly resided, and had been friends with some of her children. On July 22, 2013, Benita was in her room when she heard "several" gunshots and then noticed Henry bleeding in the hallway. He stated he was "hit," and "it was Tomato."

¶ 14    Edwin testified that he had two prior convictions for unauthorized use of a weapon. He and Henry had been members of the Latin Kings, while defendant and Andres were La Raza members; one of Edwin's convictions, for which he received three years' imprisonment, resulted from a fight with Ramon. In March 2013, police officers questioned Edwin regarding Andres's shooting, but did not charge him. Around that time, the Garcia home in Chicago was "shot up" and the family moved to Posen. Edwin was not at home during the July 22, 2013, incident in Posen, but arrived moments later and went to the hospital with Benita to see Henry.

¶ 15    On cross-examination, Edwin agreed he was upset with Ramon as he believed Ramon reported him to the police. He denied shooting Andres, or that Henry told the police that Edwin admitted he shot Andres.

¶ 16 Posen police officer Vincent Luna testified that he responded to a report of shots fired at approximately 3:45 p.m. on July 22, 2013, at a residence on the 14000 block of Sherman Avenue. He noticed "several bullet holes on the residence," and found Henry bleeding and in "bad condition." Luna believed Henry would "bleed out." Henry said that he "saw Ramon's red" vehicle, but did not identify the shooter.

¶ 17 Douglas Hoglund, chief of police for Posen in July 2013, testified that he also responded to the scene and did notice Henry, but did not speak to him until later that day in the hospital. Henry informed Hoglund that Tomato shot him while driving a "red car." The next day, Henry provided Hoglund with the same information. Hoglund also spoke to Edwin and showed him a photograph of defendant, whom Edwin identified as "Tomato."

¶ 18 Following defendant's arrest, but prior to interviewing him, Hoglund informed him of his *Miranda* rights. Defendant stated the only shooting he knew of was when Edwin shot Andres.

¶ 19 On cross-examination, Hoglund acknowledged that a red Chrysler Pacifica which he recovered during defendant's arrest was owned by someone named Pedro Ocampo, not defendant or Ramon. Hoglund agreed that on July 23, 2013, Henry said the red vehicle "looked like" Tomato's vehicle, not that it was Tomato's vehicle.

¶ 20 Posen police sergeant Ryan Grab testified that officers arrested defendant on October 9, 2013. Grab arranged a physical lineup which included defendant, and Henry viewed the lineup and identified defendant as the shooter.

¶ 21 Illinois State Police sergeant Cary Morin, a crime scene investigator, testified that he recovered cartridge casings from the scene on July 22, 2013, including nine .40-caliber casings from outside the residence and additional "projectiles" from inside. He also identified 14 defects

in the front of the house he believed to be bullet holes. His "bullet trajectory analysis" demonstrated that "the shooter was positioned somewhere in the roadway."

¶ 22    The State entered two stipulations. First, if called, Illinois State Police forensic scientist Jeff Parise would testify that he examined nine cartridges and concluded they were fired by the same firearm. He also examined six fired bullets, three fired bullet jackets, and three bullet cores. The six fired bullets could not be identified with the jackets, two of the three jackets were from the same firearm, and the three cores were not suitable for comparison. Second, if called, Henry's treating physicians would testify regarding his injuries and course of treatment, and that Henry reported that he was shot "while sitting in his house."

¶ 23    Defendant then entered two stipulations. The first stated that photographs attached to the stipulation accurately depicted defendant's tattoos as of July 22, 2013. The second addressed multiple police officer witnesses.

¶ 24    First, Chicago police detectives Robert Garcia and Gregory Jones would testify that during the investigation of Andres's shooting, Henry told the detectives that Edwin said he shot "the Avitias." Next, Posen police sergeant Robert Quirk would testify that he responded to the shooting on July 22, 2013, and heard Henry state the next day that the red Chrysler "looked like" Tomato's vehicle; when viewing the photographs of the vehicle, Henry also stated that it "looked similar" to the shooter's vehicle. Finally, Posen police officer Glenn Runk would testify that Henry provided a written statement on October 10, 2013. Henry did not tell Runk that he told his mother "Tomato" shot him. Henry did relate that he looked out the window near the front door when he saw the red vehicle. Runk would also state that Henry testified before the grand jury that he looked out the kitchen window when he saw the red vehicle.

¶ 25    Following closing arguments, the court found defendant not guilty of attempted murder but guilty of aggravated battery with a firearm and aggravated discharge of a firearm. In so finding, the court explained that it found Henry's testimony credible, and the impeachment of Henry "minor." The court continued that, "[o]f course there's no description of Tomato" in the record because Henry was already very familiar with defendant.

¶ 26    The court denied defendant's motion for a new trial. After a hearing, the court merged the offenses and sentenced defendant to 20 years' imprisonment for aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)), and denied defendant's motion to reconsider sentence.

¶ 27    On appeal, defendant claims the evidence was insufficient as Henry's identification testimony was unreliable and no other evidence linked defendant to the shooting.

¶ 28    When reviewing the sufficiency of the evidence, the reviewing court must construe all of the evidence in favor of the State and determine whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. All reasonable inferences must be drawn in favor of the State. *People v. Eubanks*, 2019 IL 123525, ¶ 95. The reviewing court will not substitute its judgment for that of the factfinder regarding witness credibility or the weight of the evidence. *People v. Hardman*, 2017 IL 121453, ¶ 37. Reversal is improper unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates reasonable doubt of the defendant's guilt. *Id.*

¶ 29    When a defendant challenges the reliability of a witness's identification, the reviewing court must consider whether the identification was reliable based on the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Factors include (1) the witness's opportunity to view the accused, (2) the witness's degree of attention, (3) the accuracy of prior

descriptions, (4) the witness's level of certainty, and (5) the length of time between the crime and confrontation. *Id.* at 199-200. Where the witness previously knew the accused, the reliability of the identification is strengthened. *People v. Jones*, 187 Ill. App. 3d 823, 831 (1989). Identification testimony from a single witness, if credible, is sufficient to sustain a guilty finding. *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 30    The record sets forth that Henry had known defendant for some years prior to July 22, 2013. During the incident, Henry was looking out his window when he noticed a red vehicle he recognized as defendant's approach. Henry's various accounts were inconsistent regarding whether this was the kitchen window or front window. Henry did identify defendant as the driver and that he held a firearm. Henry dropped to the floor, felt pain in his back, then crawled towards his mother's room. Immediately following the shooting, he told his mother that "Tomato" shot him. Henry later identified "Tomato" as the shooter to police officers while in the hospital, and identified defendant's vehicle in a photograph and defendant himself in a physical lineup approximately three months later.

¶ 31    On this evidence, we find that a rational factfinder could find Henry's testimony credible and find it sufficient to establish defendant's guilt. Regarding his opportunity to view defendant, Henry testified at trial that he noticed defendant's vehicle approach, and after it stopped, recognized defendant as the driver and observed him holding the firearm. This is a sufficient opportunity to identify the shooter, particularly where the witness already knew the defendant, and thus this factor favors reliability. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 30 (period of seconds can be sufficient opportunity to observe a defendant). Next, the record is clear that Henry paid full attention to the vehicle and driver, which also favors reliability.

¶ 32 Defendant argues that Henry's testimony suggests he focused on the firearm, not the shooter, as Henry described the firearm as silver. This does not indicate, however, that Henry was so distracted that he could not identify the shooter, and is instead consistent with his testimony that he first noticed defendant, then observed that he held a firearm. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 87 (identification reliable where witness "did not continue looking at the driver after the first shot [but] *** testified that he knew defendant from around the neighborhood and did not waver from his identification"). The accuracy of a prior description is not relevant here; as the trial court noted, Henry knew defendant by name, and thus had no reason to provide a physical description. Finally, the certainty and time between identification factors favor reliability, as Henry was certain immediately that defendant was the shooter, and never wavered. *Id.*

¶ 33 Defendant cites scientific studies on the general unreliability of eyewitness identifications, and posits that Henry was in a stressful situation and may have focused on the firearm. Defendant argues that Illinois courts have acknowledged the studies which identify those factors as relevant to reliability, and thus contends we should consider them in this appeal. Those cases, however, involved disputes over whether proffered expert testimony about the reliability of eyewitness identifications should have been admitted at trial. See *People v. Lerma*, 2016 IL 118496; *People v. Starks*, 2014 IL App (1st) 121169; *People v. Allen*, 376 Ill. App. 3d 511 (2007); *People v. Tisdel*, 338 Ill. App. 3d 465 (2003). Here, defendant proffered no expert testimony and no evidence regarding these scientific studies was before the trial court. Consequently, we may not consider them for the first time on appeal. See *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 4 (citing *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994)).

¶ 34    We may, however, consider defendant's arguments regarding the circumstances of the incident, the firearm, and Henry's attention levels in the context of the *Biggers* framework. Additionally, defendant argues, as he did at trial, that the history between the Garcia and Avitia families motivated Henry to falsely accuse defendant of the shooting. Defendant also notes the differences in Henry's account regarding from which window he saw the red vehicle approach, and whether the vehicle was an SUV.

¶ 35    All of this evidence was adduced at trial, alongside evidence that Henry consistently asserted that "Tomato" shot him, and that other witnesses, including Hoglund, corroborated Henry's identification. We must defer to the factfinder on which witnesses testified credibly. See *Hardman*, 2017 IL 121453, ¶ 37. On this record, Henry's testimony and the remaining evidence was not so improbable or unlikely that we may substitute our judgment for that of the trial court on the matter of Henry's credibility. Based on this finding, there was sufficient evidence from which a reasonable factfinder could have found defendant guilty. See *Gray*, 2017 IL 120958, ¶ 36 (testimony from a single eyewitness, if credible, is sufficient to sustain a guilty finding).

¶ 36    For the foregoing reasons, defendant's conviction is affirmed.

¶ 37    Affirmed.